[No. 1584.]

## LEE WALKER v. THE STATE.

1. MURDER—INDICTMENT—ARREST OF JUDGMENT.—An indictment for murder alleged that in manner and by means, and with instruments and weapons, to the grand jurors unknown, the defendant did feloniously, wilfully, and of his malice aforethought, deprive the deceased of his life; and embraced, in the concluding part, the words "did then and there kill and murder." *Held,* that it was sufficient to allege that the murder was committed by ways or means and manner, and by instruments and weapons, to the grand jurors unknown; that the words "deprive of life" are equivalent to the word "kill," and that the concluding part of the indictment was sufficient to charge that the defendant did kill and murder the deceased; wherefore a motion in arrest of judgment, based upon the insufficiency of the indictment, was properly overruled.

2. EVIDENCE—EXPERT TESTIMONY—STANDARD OF COMPARISON IN PROOF OF HANDWRITING.—See the statement of the case for evidence held sufficient to establish the competency of a witness to testify as an expert upon handwriting, and to establish the competency of certain written instruments used in evidence as standards of comparison.

3. MURDER—CHARGE OF THE COURT—EXPRESS MALICE—FACT CASE.—Express malice is an element of murder in the first degree which must be proved and cannot be inferred. The actual existence of express malice is manifested by external acts or circumstances which may transpire before, at the time of, or immediately after the killing. It is not required that express malice be demonstrated by the evidence with mathematical precision, but it is required that the evidence be sufficient to satisfy and convince the jury of its existence, and it may be direct or circumstantial. See circumstantial evidence in this case which not only authorized but required a charge upon express malice and murder in the first degree.

4. PRACTICE IN THIS COURT.—While it is provided by Article 676 of the Code of Criminal Procedure that "the jury are the exclusive judges of the facts in every criminal case," and by Article 728 that "the jury in all
M1

cases are the exclusive judges of the facts proved and the weight to be given the testimony, except," etc., the statute (Article 870 of the Code of Criminal Procedure) confers upon this court the authority to revise a verdict as to whether it is or is not supported by or against the weight of the evidence. If not, this court is required to remand the case for new trial.

5. SAME—EVIDENCE.—Notwithstanding the general practice of this court not to set aside a verdict when the evidence, though conflicting, is sufficient, if believed, to support the finding of a jury, this court will not hesitate to set aside such a verdict when it appears that it is wrong, and it is clear that injustice has been done the defendant. See the opinion *in extenso* on the question.

6. SAME.—In passing upon the facts of a case on appeal, this court is governed by the following rules:

    1. Where the evidence is conflicting, and there is sufficient, if believed, to prove the case of the State, the jury being the exclusive judges of the credibility of the testimony, their verdict will not be set aside unless it clearly appears to be wrong.

    2. Where there is no testimony to support it, the verdict will be set aside.

    3. Where the evidence is insufficient to rebut the presumption of innocence, the verdict will be set aside.

    4. Where the verdict is contrary to the weight of evidence, it will be set aside.

7. MURDER—CORPUS DELICTI.—Article 549 of the Penal Code provides that "No person shall be convicted of any grade of homicide unless the body of the deceased, or portions of it, are found and sufficiently identified to establish the fact of killing;" wherefore, it is held that, in order to sustain a conviction for culpable homicide, it is indispensable that a dead body, or portions of a dead body, be found, and be clearly proved to be the body or portions of the body of the person alleged to have been killed. It is equally indispensable that the death of the alleged dead person shall be clearly established before a conviction can be had, however cogent may be the other facts proved against the defendant; and the authorities concur that this proof must be clear and satisfactory beyond a reasonable doubt, and that not even the extra judicial confession of the accused that he killed the person alleged to have been killed, will, uncorroborated by other evidence of the death, be sufficient to warrant conviction.

8. SAME—FACT CASE.—See evidence held insufficient to support a verdict of murder in the first degree, because it fails to establish the death of the alleged murdered person, and because it fails to identify the body as that of the person alleged to have been murdered.

APPEAL from the District Court of Hood. Tried below before the Hon. T. L. Nugent.

W. B. Mathis, an employe of the appellant's father, disappeared from the residence of the latter, in Hood county, Texas,

on the night of April 28, 1882, since which time he has never been seen alive by any of the parties who testified upon this trial. On or about the tenth day of the following August the mutilated body of a man was found floating in the Brazos river, at a point near Richmond, Fort Bend county, Texas, a distance, by the meanderings of the river, of between six and nine hundred miles from the residence of the appellant's father, in Hood county. The indictment, filed on the twentieth day of September, 1883, charged the appellant with the murder of the said Mathis. Upon the theory that the body found in the Brazos river in Fort Bend county was that of W. B. Mathis, and that he was murdered by the appellant, the appellant was, at the September term, 1882, of the District Court of Hood county, prosecuted to conviction for murder in the first degree, and was awarded a life term in the penitentiary.

W. M. Barnett was the first witness for the prosecution. He testified that on the twenty-eighth day of April, 1882, he lived within a half mile of the residence of Doctor Walker, the father of the defendant. He knew W. B. Mathis, who at that time was, and for some time had been working for Doctor Walker. Mathis disappeared from Doctor Walker's on the night of that day— April 28, 1882. The witness saw Mathis at his, witness's, house on the Sunday before he disappeared, and saw him in Doctor Walker's field after that Sunday and before his disappearance.

On the morning of April 29, 1882, about sunrise, the witness saw the defendant, Lee Walker, pass his, witness's, house, going from Doctor Walker's house, in the direction of Weatherford, in Parker county. The defendant afterwards said that he went to Weatherford on that day. On or about the twenty-fifth day of July, 1882, the witness had a conversation with the defendant, during the course of which the defendant said that when in Weatherford, on the day mentioned, he saw Bill Mathis, the alleged deceased. He said that he went into a gambling room while there, and watched a game of cards to discover some of the tricks, which he did. Among those of a party playing was a New Yorker, who lost on the game. After the game closed, the New Yorker asked him if he was enabled to detect any of the tricks of the game. He said that he told the New Yorker that he did detect the tricks, and then told him that he knew a green fellow in town whom he could beat out of his money. That he then went and found Bill Mathis, and inveigled him into a game, in which the New Yorker

participated, winning twenty dollars from Mathis, which Mathis refused to pay, and left. That he followed Mathis, and told him that if he did not pay the New Yorker he would get hurt. That Mathis refused to pay the New Yorker, but agreed to pay him, Lee Walker, the amount, if he would buy the account. That the New Yorker gave him the account, and he returned to Mathis, and offered to accept fifteen dollars in liquidation. That Mathis replied that he did not have the money, but gave him an eighty dollar note on Ed. Mathis for collection, instructing him to retain fifteen dollars of the amount, and, upon collection, to account to him for the balance. That he took the note to a banker to get the bank to collect it, but it was refused, because too small in amount to justify the trouble. That he then went with the note to the bank of Henry Warren & Co., but found that bank closed. That a few days later he again went to Weatherford, and at that time deposited the note with Henry Warren & Co., for collection. That on July 1, 1882, he was again in Weatherford, and called on Warren & Co., and was informed that the money had been collected, but that the bank had been notified by J. C. Mathis not to pay it to him, Walker. That the banker asked him what right he had to the note, and that he replied that he had obtained it from Bill Mathis, himself. That the banker thereupon suggested that he execute an indemnity bond against any other claimant. That he went to Mr. Starr, and obtained from him an order upon which the bank paid him the money, which money he deposited in Starr's safe. That he went to Weatherford again on July 5, 1882, and met W. B. Mathis, and, after retaining his fifteen dollars, paid Mathis the money on the note, for which he took Mathis's receipt.

The witness was at Doctor Walker's house on the day after the night on which the defendant claimed to have had a fight with horse thieves at the horse lot. The defendant related the particulars of the fight to the witness. He said that he was in the house, and heard some parties at the lot. That he took his shot gun and went to the lot, where he saw a man in the act of leading off one of his father's horses. That he started toward the man, who let the horse loose and started toward him, whereupon he fired, shooting the man through the left arm. That about this time two other men rushed up. That he discharged the remaining load at the first man but another man knocked the gun up, and the load went into a fence rail. That this last man had a large knife in his hand. That he, defendant, caught this

man's knife-hand with one of his hands, and with the other drew a derringer from his pocket, with which he shot one of the other two men. This man fell, shot through the breast. That he then ran his free hand into his pocket and brought forth a knife, the large blade of which he opened with his thumb and teeth, and began to stab the man whose hand he still held. That he struck the man several times in the side with the knife, but for some unexplainable reason was unable to cut him. That he then stabbed him three times in the breast, when the man flounced loose, and he, defendant, returned to the house. He said that he knew he killed one, and thought he killed two of the parties. He said that he knew the one he killed was Bill Mathis, and he thought the other was John Mathis, but was not sure. He also told the witness in that conversation, that about ten days before that he shot, and thought he killed, another man who was trying to steal a horse from the same lot.

On the morning after the alleged fight the defendant showed the witness the place where he said it took place. The witness examined the ground critically, and found a spot of blood about the size of a silver dollar; also two leaves with blood spots on them. He also saw indications of "stamping around," and where a load of shot had penetrated a fence rail. He saw no other indications of a struggle. This conversation took place near Doctor Walker's place. No one else was present. The witness heard the defendant make substantially the same statement about the fight to some one in the presence of Mr. Carraway. The witness met the defendant near, and going into Weatherford, on July 5, 1882.

Cross-examined, the witness denied that on the examining trial he stated that the blood spot he found on the battle ground was as large as the palm of his hand, and averred that if it was so written in his testimony on that trial it was a mistake. He was confronted with his written testimony, in which he is made to say that the blood spot was as big as his hand.

J. C. Mathis was the next witness for the State. He testified that he and his brother, W. B. Mathis, the alleged murdered man, removed from Mississippi to Texas in January, 1882, and went to work for Doctor Walker, the appellant's father, on February 12, 1882. On March 15, of the same year, they quit working for Doctor Walker and went to Granbury. At Granbury the witness and his brother, W B. Mathis, separated, the witness going to Palo Pinto county, and W. B. Mathis returning to

the employ of Doctor Walker. Christian, Palo Pinto county, Texas, became the witness's postoffice after he and his brother separated. The witness had often seen his brother write, and knew that the postal card shown him was in his brother's handwriting. The postal card was put in evidence and was as follows:

(Address.)
"*J. C. Mathis, Christian, Palo Pinto, Texas.*"

(Card.)
"THORP SPRINGS, HOOD Co.

"J. C. Mathis. Dear brother: · I have received 4 letters from home and two for you, and they want you to write. I am getting a longe splendid with the Doctor. this is the 8 of april, in six days my month will be out, tho I expect to stay there all the year. I like him better than ever. Willie did not stay in texas but 5 days. John, our people is getting along splendit. I am fixt up for going to see the girls.
"W. B. MATHIS."

Continuing his testimony, the witness stated that he wrote to Doctor Walker, making inquiries about W. B. Mathis, and, in reply, received a letter purporting to have been written by Lee Walker, the defendant. It was addressed to J. C. Mathis, Christian, Palo Pinto county, Texas. The witness here identified a letter shown him as that purporting to have been written to him by Lee Walker, and an envelope as that in which the letter was enclosed. He had never received any other letter from the defendant.

J. H. Stribling next testified, for the State, that on or about August 12, 1882, the defendant, in the course of a conversation, told him that a postal card addressed to his father by J. C. Mathis, asking about W. B. Mathis, was received at the house, and that he, in the absence of his father, had replied to it, addressing it to J. C. Mathis, Christian, Palo Pinto county, Texas.

W. F. Altfather was the next witness for the State. He testified that he saw the defendant, to know him, for the first time on the fourth day of May, 1882, in the banking house of Henry Warren & Co., in Weatherford, Texas, of which bank the witness at that time was cashier. Defendant brought to the witness at that time a note for eighty dollars, payable to W. B.

Mathis or bearer, and drawn by Ed. Mathis, of Energy, Clark county, Mississippi. He asked the witness if it could be collected. Witness replied that he could forward it to a bank for collection, which the defendant requested him to do. He then asked the witness how long it would take to collect the money on the note. The witness replied that he did not know, but that when he heard from it he would notify him. To this the defendant agreed, but instructed the witness to notify him by letter, and not by postal card, as he did not want others to know anything about his business. The witness forwarded the note, and received the money on it about the last of June, 1882. On the first day of July, 1882, the defendant came to the bank and asked if any advice had been received of the money. Witness replied that he had received the money on the note, and also a letter from Mathis making inquiries about it, and that in consequence of the contents of that letter he would not pay the money on the note until satisfied that defendant was entitled to receive it. The defendant replied that he had a written authority from W. B. Mathis to collect the note, but did not have it with him. The witness suggested to him that the money would remain on deposit until he could return home and get his authority. Defendant replied that it was possible he had lost the authority. The witness then suggested that he get an order from W. B. Mathis. To this suggestion the defendant replied that he did not know where Mathis could be found. Witness then suggested that he secure the bank by an indemnity bond. To this the defendant agreed, left the bank, and soon returned with an order or recommendation from Mr. Starr, on which the witness paid him the money. The witness wrote the check for the money, which is here exhibited, and the defendant signed it in the presence of the witness. The check, which was then put in evidence, reads as follows:

"No. ....                "WEATHERFORD, TEXAS, July 1, 1882.
"*Henry Warren & Co., Bankers:*
    "Pay to Lee Walker or seventy-nine and $\frac{50}{100}$ dollars.
    "$79$\frac{50}{100}$                        LEE WALKER."

A few days after this transaction the defendant came into the bank and exhibited to the witness what purported to be an authorization to Lee Walker to collect the note on Ed. Mathis.

The order was identified and read in evidence. It was as follows:

"This, the twenty-ninth day of April, 1882, I authorized Lee Walker to collect one eighty dollar note of Ed. Mathis, who resides near Energy, Clark Co., Miss.

"W. B. Mathis."

This order the defendant left with the witness, and at the same time exhibited to him what purported to be a receipt from W. B. Mathis for eighty dollars paid to him by the defendant. The witness proposed to retain this receipt, but the defendant objected, pleading that he wanted it as evidence of his payment of the money, and the witness returned it to him.

At the time this trial was, and since 1879, the witness had been engaged in the banking business, and at the time of the transactions with the defendant was cashier of the bank of Henry Warren & Co., in which position he remained until the summer of 1882. In the discharge of his duties as a cashier, the witness had found frequent occasion to examine signatures in order to determine their genuineness, and considered himself a capable expert of signatures and handwriting. The opinion of the witness as an expert was that the signature to the letter addressed to J. C. Mathis and signed "Lee Walker," is in the handwriting of the defendant. The body of the letter addressed to "Ed. Mathis, Energy, Clark county, Mississippi," and signed "W. B. Mathis," the witness believes to be in the same handwriting as the letter addressed to "J. C. Mathis, Christian, Palo Pinto county, Texas," and signed "Lee Walker," and the witness had no doubt that the signature "W. B. Mathis" to the letter written to Ed. Mathis is in the same handwriting as the letter written to J. C. Mathis. In some respects the handwriting in the body of the letter to Ed. Mathis does not seem to be the same as that of the letter to J. C. Mathis, and it appears to have been an attempt on the part of the writer to disguise his hand. The address on the envelope to Ed. Mathis, Energy, Clark county, Mississippi, and postmarked "Weatherford, Texas, July 5, 1882," the witness believed to be in the handwriting of the same person who wrote the letter to J. C. Mathis signed "Lee Walker."

Cross-examined, the witness stated that he did not pretend that it was impossible he could be mistaken in his conclusion that the same person wrote the letters and the address on the

envelope. It was his opinion as an expert that they were all written by the same person.

The letter to Ed. Mathis signed "W. B. Mathis," and the envelope addressed to Ed. Mathis, Energy, Clark county, Mississippi, were here read in evidence. The envelope, postmarked "Weatherford, Texas, July 5," and addressed as above, was first introduced. The letter reads as follows:

"WEATHERFORD, TEXAS, July, 1882.

"I seat myself to you know whare I am it has been a long time sins I have heard from you I have been on the travell I am now on my way to the silver mines in Mexico I am going to by me a pair of horses needing the money you had of mine I got Lee Walker to take it to the bank at Weatherford to collect thanking you for sending it and Lee for his trouble as he would not charge me a cent I have made $125 sins I come to Texas I can make 4 dollars a day when I get my horses.and get to the silver mines I have lost track of John I wrote letters but no answers come I do not know when I will write again I is hot and dry in Texas crops very good excuse me for writing so bad it is so hot I am very nervous and my paper is very bad and I am writing in the post office witch is very disagreeable having to stand up. I would like to hear from you but I will soon will be on the travel                    W. B. MATHIS."

Proceeding with his testimony, the witness stated that an envelope addressed to J. C. Stribling, and the letter to J. C. Stribling signed by "One on the Scout" were, in his opinion, written by the same person who wrote the letter to J. C. Mathis signed "Lee Walker." The letter to J. C. Stribling, and the envelope addressed to J. C. Stribling, Granbury, Hood county, Texas, and postmarked "Thorp Springs, Texas, August 10, 1882," were here read in evidence. The letter is as follows:

"*Mr. J. C. Stribling:*

"I wish to give you some information in regard to the Royal Horse ring; but circumstances will not admit a personal interview. Therefore I will take advantage of the mail. July the 18th, the members of the ring tried to take a horse from the Walker lot; was halted by Lee Walker, the thieves made fight, but one was shot through the left lung, causing death within 15 hours. This inraged the Captain, who was a brother of the

dead man, who went the next night and droped a note order-ing Lee Walker to leave the State within ten days or his life was at stake.  Walker would not leave and the company resolved to kill him.  Meeting with one W. B. Mathis, who was an enemy of the Walkers (because he could not, by the aid of the Parker County Bank keep from paying him twenty dollars that he was owing him) Promised to pay Mathis 20 dollars to go with them to kill Walker.  Mathis agreed to go, assuring them that if they would not kill him, they would make the bankers believe that he stole a note from Mathis; July 25 was the time to do the work.  The order was to get all the horses they could before they tried to kill him.  The Captain caught one horse was tak-ing him out when he was haulted by L W.  Two men come at W with knives; one was shot with a pistol and stabbed with a knife twice; witch caused death within two hours  The Captain was shot with a gun and stabed with a knife three times (be-sides other flesh wounds) witch caused death within six hours The thieves were sunk beneath the rolling waters of the Brazos. After the fight was over Walker started to the house, met a man who jumped behind a fence but was shot with a pistol in the left side witch will cause death if not cared for.  I learned the above from the wounded man; he says that there is several left yet; but they have squandered.  The wounded man says that he will not bother Lee Walker after this, but thinks that he will be killed by others.  It is somewhat imbarrissing to write this letter; but is the best I can do at present.

"Yours Respectfully,

"ONE ON THE SCOUT."

This witness also testified that it was his opinion the docu-ment purporting to authorize Lee Walker to collect the note on Ed. Mathis, and signed "W. B. Mathis," was written by the same hand that wrote the letter to J. C. Mathis, Christian, Palo Pinto county, Texas, and which was signed "Lee Walker." The witness had examined these several documents with a mag-nifying glass, such as is used by bankers in testing the genuine-ness of signatures, and is of opinion that they were all written by the same person.  These several documents comprise the bank check, the instrument authorizing Lee Walker to collect the Ed. Mathis note, signed " W. B. Mathis," the letter to J. C. Mathis, signed "Lee Walker," the directions on the envelope to J. C. Mathis, Christian, Palo Pinto county, Texas, the letter to

Ed. Mathis, signed " W. B. Mathis," the writing on the envelope directed to Ed. Mathis, Energy, Clark county, Mississippi, the letter signed " One on the Scout," and the writing on the envelope addressed to J. C. Stribling, Granbury, Hood county, Texas.

A. F. Starr was the next witness for the State. He testified that in June and July, 1882, he was in business in Weatherford. On the first day of July of that year the defendant came to the witness's store and requested the witness to assist him in collecting some money from the bank. He said the bank had not treated him right. Witness did assist him by assuring the bank that he was all right. The defendant got the money and deposited it in the witness's safe. A few days later he returned and exhibited a writing concerning the matter, to which the witness, being busy, paid no special attention, but gave him the money on it.

W. T. Simmons testified, for the State, that sometime during the first part of the month of July, 1882, he met the defendant in Miller's drug store, in Weatherford, Texas, and had a conversation with him about a receipt the defendant said W. B. Mathis had given him for the money paid him by defendant on the note which the bank had previously refused to pay. The receipt purported to be for the full amount of eighty dollars, less fifteen dollars which Mathis owed defendant. The defendant said that he had that morning met Mathis, walking, about three miles from Weatherford; that Mathis had writing material with him, and that he, defendant, wrote the body of the receipt, and Mathis signed it. He asked the witness if the receipt would satisfy the bank and show that he obtained the note rightfully.

L. J. Carraway testified, for the State, that he had a conversation with the defendant about the first of July, 1882, in which the defendant told him that he had had trouble with a Weatherford bank about the collection of a note on Ed. Mathis in Mississippi, which he had obtained from W. B. Mathis. He said that the bank refused to pay without indemnity against other claimants. Witness advised him to get W. B. Mathis, take him to the bank, and have him identified, to which the defendant replied that he was not the keeper of W. B. Mathis, and was not responsible for him. In reply the witness stated to him that the way the matter was shaping itself, it looked very much to him like the defendant would be held responsible for the appearance of W. B. Mathis; that he, defendant, was surrounded by very unfortunate indications

In a prior conversation, during the month of June, 1882, the defendant told the witness that he met W. B. Mathis in Weatherford, after Mathis had left Doctor Walker; that W. B. Mathis held a note against Ed. Mathis, in Mississippi, for eighty dollars; that W. B. Mathis wanted to collect the note, but thought that if he sent the note to Mississippi, Ed. Mathis, who opposed his staying in Texas, would not pay it; that W. B. Mathis owed him, defendant, a small amount, and that he, defendant, suggested that the note be placed in a bank for collection; that W B. Mathis gave him the note in the postoffice, with written authority to collect it, and that he gave a written showing of its receipt; that he, the defendant, placed the note with the bank of Henry Warren & Co. for collection, directing them to notify him upon collection; that, failing to receive notice, he eventually called on the bank, and was informed that the note had been collected, and that the bank had been notified not to pay him the money, and that the banker demanded his authority to collect it. He further stated to the witness that he was to meet W. B. Mathis in Weatherford, in July, and pay him the money. In July, some time, the defendant told the witness that the bank matter had been settled. The witness had known the defendant since his boyhood, and his character as a peaceable, quiet man had always been good.

Jacob Seela testified, for the State, to the effect that he met the defendant at Carraway's on the morning after his alleged fight with the horse thieves, described by the witness Barnett. The defendant gave the witness an account of that affair substantially as he related it to Barnett. He said that he recognized Bill Mathis as the man he shot.

J. C. Stribling testified, for the State, that he was sheriff of Hood county in 1882. On the tenth day of August of that year the defendant requested permission to carry a pistol, saying that he had a fight with horse thieves at his father's lot on the night of July 14, and another fight with horse thieves at the same place on the night of the twenty-fifth of July. He gave the witness an account of this last fight similar to that he had given the witnesses Barnett and Seela. He told this witness that he knew he had killed Bill Mathis, and he believed he had killed another. After the defendant left the witness, the latter went to the postoffice and received the letter signed "One on the Scout," read in evidence. The witness read this letter standing on the street. Having finished it he looked around and saw the

defendant standing in the drug store. Witness went to his office, whither he was shortly followed by the defendant, who stood around awhile and left.

The witness went to Thorp Springs that evening, and saw Mr. Jacobs and Mr. Rawlings, to whom he showed the envelope which covered the "scout" letter. The next morning witness went to Walker's, where he saw the defendant, and told him that he had come to assist in finding the bodies of the dead horse thieves. He showed the defendant the "scout" letter. Defendant became so much excited that he could not hold the letter steady. He read the letter rapidly and readily at first, but having read half through, he began to stop and "fumble" along, spelling out words and finding great difficulty in deciphering them. The witness and defendant made diligent but unsuccessful search for bodies. The witness led the defendant to talk about Mathis and the fight, and asked him if he had told anyone about the first fight. He replied that a few days after it occurred he and his brother were passing the place, and he remarked to his brother that he had fought and killed a horse thief there a few nights before, and that his brother replied that he lied. Witness then asked him why he did not report the matter at once, and he replied that he had thought but little about it.

Leading the defendant to talk of Mathis, the witness asked him how the New Yorker happened to win money from Mathis, and he replied that he believed it was on a game of billiards. Just as the witness was leaving, the defendant said that he understood that the witness wanted to arrest him, and, if so, he was ready to go with witness; that he had done nothing to run from, and did not intend to leave. The witness replied that he had no intention of arresting him. Witness testified that he had measured the shoes exhibited in evidence and referred to by the witnesses Doyle and Floyd, whose testimony is summarized in the opinion. They were number ten. The Brazos river was on a considerable rise on or about July 25, 1882.

George L. Jacobs, deputy postmaster at Thorp Springs, testified, in substance, that he knew positively that no letter went from Thorp Springs, addressed to Granbury, on the seven o'clock a. m. north bound mail, on the tenth day of August, 1882. The mail going south, towards Granbury, left Thorp Springs about two o'clock p. m., and the mail on that day was made up between twelve and two o'clock. Witness took the letter exhib-

ited (the "scout" letter) out of the mail box and put it in the mail sack. He did not see Lee Walker about Thorp Springs on that day.

T. F. Rawlings, for the State, testified that he recognized the "scout" letter, by the postmark, as the one exhibited to him by Stribling in Thorp Springs on the day it was mailed. The defendant was at the Thorp Springs postoffice twice on that day, and bought some stamps, or stamped envelopes. He asked when the mail hack would pass going to Granbury, to which question the witness replied that it would pass down that evening, but would not return that day. Witness assisted in making up the north bound mail on that day, and knew that no letter left Thorp Springs addressed to Granbury.

The substance of the testimony of the witnesses John Thomas, Carr Floyd and Doctor J. N. Doyle is condensed in the opinion of the court.

D. W. McDonald testified, for the State, that he was at Doctor Walker's when search was made for the body of W. B. Mathis, on or about the twelfth day of August, 1882. There was a bluff or ravine in Doctor Walker's field, much overgrown with briars, grapevine and small timber. The witness found two badly rotted and mildewed shirts in this ravine. He could at first see but a small portion of one. He called to others of the searching party, and the shirts were taken from under the dirt, which, for aught the witness knew to the contrary, might have been washed over them. The shirts exhibited are the ones found. The Brazos river is about a half mile from Doctor Walker's house.

J. C. Mathis, recalled by the State, testified that he recognized one of the shirts exhibited by McDonald as exactly similar to one which his brother, the alleged deceased, owned when he was at Doctor Walker's. The witness's mother made this shirt for an undershirt before the witness and his brother left Mississippi. The witness knew nothing about the other shirt. W. B. Mathis had a pair of saddle pockets, in which he kept his few clothes, when he and the witness separated. He had a pair of old jeans pants, and bought one pair of cotton flannel drawers after he came to Texas, that the witness knew of. He had white woolen homemade socks. The witness knew nothing of his owning any other kind of socks. One pair of the pants, testified to hereafter by the witness Henry Jones, the witness identified as at

one time the property of W. B. Mathis.   Witness had never seen the other pair before.

The witness knew the handwriting of W. B. Mathis.   Neither the letter to Ed. Mathis, signed W. B. Mathis, the envelope thereto, the purported authority to Lee Walker to collect the eighty dollar note, nor any parts of them, were in the handwriting of W. B. Mathis.   W. B. Mathis had a small buckhorn handled knife, and the witness thought another knife, of which he could give no description.   He, W. B. Mathis, could not have worn a shoe smaller than a number nine.   That number was a close fit for him.   The witness first saw the shirts exhibited in evidence shortly after they were discovered by McDonald.   When the witness last saw W. B. Mathis he was wearing a large pair of common brogan shoes, which, the witness thought, were double soled.   He had bought the shoes since the eighth day of January, and before the twelfth day of February, 1882, and had worn them pretty generally during that time.   There was nothing peculiar about those shoes.   When the witness last saw W. B. Mathis he had a passably good every day overcoat, two pairs of pants, of which one was of ordinary gray jeans and the other of dove colored satinet or cassimere.   His shirts, except his overshirts, were white.   His socks, according to the witness's recollection, were also white.

Ed. Mathis testified, for the State, that he was the father of W. B. and J. C. Mathis, and resided at Energy, Clark county, Mississippi.   W. B. and J. C. Mathis came to Texas from Mississippi in January, 1882.   The letter exhibited in evidence, addressed to Ed. Mathis, Energy, Clark county, Mississippi, dated at Weatherford, Texas, July, 1882, and signed with the name "W. B. Mathis," was received by the witness at the Energy postoffice some time early in July, 1882.   The witness had then heard nothing from W. B. Mathis for two months next preceding the receipt of this letter.   Previously letters had been received weekly by some one of the family.   This letter is not in the handwriting of W. B. Mathis.   The witness nor any member of his family had received a letter from W. B. Mathis since April, 1882.

W. B. Mathis wore a number ten shoe.   That was the number of the shoes the witness last bought for him in the summer of 1881.   He, W. B. Mathis, was a little over twenty-one years of age at the time of his disappearance.   The witness owed W. B. Mathis eighty dollars when the latter left Mississippi, for which

the witness executed his note. The note was sent to Mississippi for collection, and the witness paid it in May or June, 1882. When the witness first received the letter testified about, he did not at once discover that it was not in his son's handwriting, nor did he make the discovery until the institution of these proceedings.

Henry Jones testified, for the State, that he, W. B. Mathis, the defendant, Calvin Walker and Jim Wilson were working for Doctor Walker in the spring of 1882. The witness and W. B. Mathis worked together the day before the latter disappeared. Between sundown and dark the witness saw W. B. Mathis washing his face at Doctor Walker's house. He then had on a pair of ducking pants similar to those worn by the witness, which were brown cotton ducking. Mathis was not about the Walker premises next day. Lee Walker left on that morning, and on his return told the witness that he had been to Weatherford, and there saw Bill Mathis. He told the witness that Mathis had given him his old clothes. Witness asked the defendant for them, saying "you don't want them." The defendant declined to present them to the witness, inasmuch, he said, as Mathis might hereafter demand pay for them. The witness then bought them from the defendant, paying him a dollar a pair for the pants, with the coat thrown in. The clothes exhibited in evidence are the ones the witness purchased, and they were originally the property of W. B. Mathis. One pair of these pants are of gray woolen goods, and the other of checked striped goods.

Some time before Mathis disappeared he had a small rough-handled knife, which he traded to the defendant. If Mathis had another knife, the witness knew nothing of it. Some time before his disappearance, Mathis exhibited to witness a pair of new shoes which he had just purchased in Granbury. The shoes were of the kind exhibited by the witness Doyle, and looked like that shoe. This was about one week before his disappearance. Here the witness was shown the pocket knife, the pieces of cloth, and the sock exhibited by the witness Doyle, and testified that he had never seen any of those articles before. If W. B. Mathis ever owned such a knife, sock, or clothes of such material, the witness had never seen them. His wife did Mathis's washing.

James Formwalt, W. H. W. Duvall and R. Clark were the witnesses introduced by the defendant to sustain his character

for peace and quietude. They testified that they had known the defendant for periods varying from seven to twelve years, and that his reputation as a peaceable, law abiding citizen had always been good.

The testimony of Doctor Lancaster, for the defense, is summarized in the opinion of the court.

The motion for new trial, which was overruled, and the motion in arrest of judgment, which was likewise overruled, raised the questions discussed in the opinion.

*McCall & McCall*, and *Cooper & Estes*, for the appellant: The court erred in allowing the witness Altfather to give his opinion, as an expert, that the letter of July 5, 1882, addressed to Ed. Mathis, and signed W. B. Mathis, the letter dated July 20, 1882, addressed to J. C. Mathis, Christian, Palo Pinto county, Texas, and signed Lee Walker, and the letter addressed to J. C. Stribling, Granbury, Texas, postmarked Thorp Springs, August 10, 1882, and signed "One on the Scout," were all in the same handwriting and written by appellant, because no instrument in writing acknowledged to have been written by appellant, or sufficiently proven to have been written by him, had been introduced as a basis of comparison.

The witness, Altfather, being handed a check for seventy-nine dollars and fifty cents, purporting to have been signed by Lee Walker, stated that he wrote the check and saw Lee Walker sign it in his presence, which check was then introduced. The State then proved by J. C. Mathis, that he received the letter dated July 20, 1882, and signed Lee Walker, from the mail at Christian, Palo Pinto county, Texas; that he received it in reply to a postal card he wrote to Doctor Walker, and that it was the only letter he received from the appellant. The State also proved by Stribling that Lee Walker told him that he wrote a letter to J. C. Mathis at Christian, Palo Pinto county, Texas. Thereupon the court held that it was sufficiently proved that Lee Walker wrote the letter of July 20, 1882, to J. C. Mathis, and allowed it to be read, and permitted the witness Altfather to use it as a standard of comparison for the other letters introduced, and to give his opinion from this standard that all the other instruments offered in evidence were in the handwriting of the defendant, and written by him. (7 Texas Ct. App., 457.)

The court erred in failing to charge the jury upon the law of implied malice, as applicable to the facts of this case; in this,

N 1

there was no proof or circumstance from which the jury could determine for what purpose, under what influence, at what time, at what place, or under what motive the defendant killed the supposed deceased, if at all; and in the charge given, the court gave undue prominence to the question of express malice, when there was no evidence in the record to support such charge. The court should have confined the charge to implied malice and murder in the second degree. (36 Texas, 528, and authorities there cited; 25 Texas, 33; 28 Texas, 698; 30 Texas, 473.)

The court erred in not granting the defendant a new trial, because the jury found the defendant guilty of murder in the first degree, when there was no proof in the record of express malice, and no circumstance from which they could infer express malice.

The court erred in overruling the defendant's motion for a new trial, because the jury found contrary to the law and the evidence, the State wholly failing to identify, in whole or in part, the body found in Fort Bend county, Texas, as the body of W. B. Mathis. (Penal Code, Art. 549; *Wilson* v. *The State*, 41 Texas, 473, and 43 Texas, 325; *Taylor* v. *The State*, 35 Texas, 97; *Merritt* v. *The State*, 2 Texas Ct. App., 187; *German* v. *The State*, 14 American R., 481, and note; 18 New York Ct. App., 179; Whar. on Hom., secs. 628 *et seq.*, and 640, and notes; Whar. Crim. Law, ed. of 1880, secs. 623, 637, 324, 325, 326, and 800 to 816; 7 Texas Ct. App., 457; 4 Texas Ct. App., 436; 44 Texas, 95; 21 Grattan, Va., 809; 3 Greenl. Ev., secs. 30 and 31, and 131 and 133.

*J. H. Burts*, Assistant Attorney General, for the State.

Willson, Judge. This appeal is from a conviction of murder in the first degree—the murder of one W. B. Mathis—the penalty assessed being confinement in the penitentiary for life.

1. A motion in arrest of judgment having been made by defendant, and overruled by the court, which motion is based upon alleged defects in the indictment, it is proper that we should first consider and dispose of the questions presented by the motion.

After alleging, in the usual form, an assault upon W. B. Mathis, the indictment proceeds, "and that he, the said Lee Walker, him, the said W. B. Mathis, in some way and manner, and by some means, instruments and weapons to the grand jurors unknown, did then and there feloniously, wilfully and of

his express malice aforethought, deprive of life, so that he, the said W. B. Mathis, then and there instantly died.  And so the grand jurors aforesaid, upon their oaths aforesaid, do say and present that he, the said Lee Walker, him, the said W. B. Mathis, in manner and form aforesaid, feloniously, wilfully, by and of his express malice aforethought, did then and there kill and murder."

In two particulars, it will be noticed, this indictment is unusual in form.  1. It does not allege the means, instrument or weapon with which the murder was effected.  2.  Instead of alleging in the language of the statute that the defendant did *kill* the deceased, it substitutes the words did "deprive him of life."

As to the first mentioned peculiarity, it is well settled that it is sufficient to allege that the murder was committed "in some way or manner, and by some means, instruments and weapons, to the jurors unknown." (*Com.* v. *Webster,* 5 Cushing's Rep., 295; *State* v. *Wood,* 53 N. H., 484; *State* v. *Burke,* 54 N. H., 92; *State* v. *Williams,* 7 Jones, N. C., 446; *People* v. *Cronin,* 34 Cal., 191; *People* v. *Martin,* 47 Cal., 96; *Com.* v. *Martin,* 125 Mass., 394; 1 Whart. Prec., 114; Whart. Cr. Ev., sec. 93; 1 Arch. Cr. Prac. and Pl., 787, note 1.)

As to the second, we are of opinion that the words "deprive of life" are equivalent to the word "kill," and, even if they were not, the concluding portion of the indictment distinctly charges that the defendant did *kill* and murder the deceased.

We think the indictment, though departing from the usual form, in the particulars we have mentioned, is sufficient, and that the motion in arrest of judgment was properly overruled. (*Dwyer* v. *The State,* 12 Texas, 535.)

2.  Upon the trial certain letters and other writings were introduced in evidence by the prosecution, mainly upon the testimony of a witness who was permitted to testify, as an expert, that in his opinion the letters and other writings were in the handwriting of the defendant.  This witness based his opinion upon having once seen the defendant write his name, and upon comparing the letters and other writings introduced in evidence with a certain letter which the prosecution claimed had been established as the writing of the defendant.  These letters and other writings were objected to by the defendant upon the ground that the handwriting used by the witness as a standard of comparison was not sufficiently established as the writing of

the defendant. We are of the opinion that the standards of comparison were clearly established in full compliance with the rules of law governing in such cases. (*Eborn* v. *Zimpelman*, 47 Texas, 503; *Phillips* v. *The State*, 6 Texas Ct. App., 364; *Hatch* v. *The State*, 6 Texas Ct. App., 384; *Heacock* v. *The State*, 13 Texas Ct. App., 97.) No question is made as to the competency of the witness to testify as an expert. He fully qualified himself to testify in that capacity. We are clearly of the opinion that the court committed no error in admitting the evidence objected to by the defendant.

3. It is objected to the charge of the court that it should not have embraced murder in the first degree; that there was no evidence proving or tending to prove express malice on the part of the defendant, and that therefore the charge should have been confined to murder in the second degree. While express malice must be proved and cannot be inferred, still, like other facts, it may be proved by circumstantial evidence. Its actual existence is manifested by external acts, and these external acts or circumstances may transpire before, at the time of, or immediately *after the killing.* (*McCoy* v. *The State*, 25 Texas, 33; *Gaitan* v. *The State*, 11 Texas Ct. App., 544; *Jackson* v. *The State*, 9 Texas Ct. App., 114; *Richarte* v. *The State*, 5 Texas Ct. App., 359.)

It is not required that express malice should be demonstrated to mathematical certainty by the evidence; all that is required is that the evidence be such as is reasonably sufficient to satisfy and convince the jury of its existence. We think the evidence in this case not only authorized, but required the court to charge upon murder in the first degree. If the defendant killed Mathis, the evidence, in our opinion, would well warrant a verdict that he committed the act with express malice. It was a question for the jury alone to determine, and the learned trial judge was correct in submitting to them the issue. We find no error in the very able and impartial charge of the trial judge.

4. We come now to the consideration of the most serious and difficult question in this case, and that is: Does the evidence support the verdict of the jury? It is insisted by the Assistant Attorney General that it was the peculiar province of the jury to determine the facts, and that this court has no authority to set aside the verdict where there is *any* evidence to sustain it; and he contends that there is sufficient evidence to sustain the verdict in this case.

With reference to the authority of this court to set aside a verdict when that verdict is, in our judgment, against the weight of the evidence, or not supported by it, we think the statute confers it. Article 870 of the Code of Criminal Procedure provides: "The Court of Appeals may revise the judgment in a criminal action, as well upon the law as upon the facts; but when a cause is reversed for the reason that the verdict is contrary to the weight of evidence, the same shall, in all cases, be remanded for a new trial."

With reference to trials by jury it is provided: "The jury are the exclusive judges of the facts in every criminal cause." (Code Crim. Proc., Art. 676.) And again it is provided: "The jury in all cases are the exclusive judges of the facts proved, and of the weight to be given to the testimony, except," etc. (Code Crim. Proc., Art. 728.)

While Article 870, above quoted, expressly confers the authority to revise the *facts,* and to reverse the judgment for the reason that the verdict is contrary to the *weight of evidence,* it has been the general practice of this court to refuse to set aside a verdict where the evidence was *conflicting,* but where there was *sufficient,* if believed, to support the finding. (*Addison* v. *The State,* 3 Texas Ct. App., 40; *March* v. *The State,* Id., 335; *Lockhart* v. *The State,* Id., 567; *Blake* v. *The State,* Id., 581; *Baltzeager* v. *The State,* 4 Texas Ct. App., 532; *Reardon* v. *The State,* Id., 602; *Ridout* v. *The State,* 6 Texas Ct. App., 249; *Slaughter* v. *The State,* 7 Texas Ct. App., 123; *Brown* v. *The State,* 8 Texas Ct. App., 48; *Douglass* v. *The State,* Id., 520; *Bright* v. *The State,* 10 Texas Ct. App., 68; *Jones* v. *The State,* 12 Texas Ct. App., 156.)

But even in such case, where it was manifest that the verdict was wrong, and it was clear that injustice had been done the defendant, it has been set aside, though there was evidence sufficient to support it. (*March* v. *The State,* 3 Texas Ct. App., 335; *Lockhart* v. *The State,* Id., 567; *Blake* v. *The State,* Id., 581; *Templeton* v. *The State,* 5 Texas Ct. App., 398; *Gamble* v. *The State,* Id., 421; *Johnson* v. *The State,* Id., 423.)

And it has never been doubted, but has always been considered by this court, not only that it had the authority, but that it was its duty to set aside a verdict where that verdict was contrary to the evidence, or unsupported by it, though it is with reluctance that the court will disturb a verdict where there is any evidence to sustain it. (*King* v. *The State,* 4 Texas Ct.

App., 256; *Jones* v. *The State*, 4 Texas Ct. App., 436; *Tollett* v. *The State*, 44 Texas, 95; *Jones* v. *The State*, 5 Texas Ct, App., 86; *Barnell* v. *The State*, Id., 113.) The law "imposes upon the trial court in the first instance, and afterwards on this court, the responsibility of determining whether or not there has been adduced before the jury a sufficient amount of competent evidence as would render it safe to allow the verdict to stand and become a precedent in the adjudication of offenses under the law. The performance of this duty on the part of the court is the exercise of a legal discretion and judgment as to what facts should be sufficient to rebut the legal presumption of innocence to which every one is entitled who is put upon his trial for an offense."

Numerous cases appear in the Reports, both of our Supreme Court and of this court, where verdicts have been set aside because unsupported by the evidence, or contrary to the weight of the evidence. From a careful consideration of the cases in which this subject has been discussed, we deduce the following rules of practice governing this court, viz.:

First. Where the evidence is conflicting, and there is sufficient, if believed, to prove the case of the State, the jury being the exclusive judges of the credibility of the testimony, their verdict will not be set aside unless it clearly appears to be wrong.

Second. Where there is no testimony to support it, the verdict will be set aside.

Third. Where the evidence is insufficient to rebut the presumption of innocence, the verdict will be set aside.

Fourth. Where the verdict is contrary to the weight of the evidence, it will be set aside.

Believing, therefore, that we are not only authorized, but that it is our duty to pass upon the sufficiency of the evidence to sustain the conviction in this case, we will proceed to a consideration of the facts as presented in the record, for the purpose of answering the question before propounded, "Does the evidence support the verdict of the jury?"

To sustain the conviction, what was the first fact essential to be proved by the prosecution? Evidently, the death of W. B. Mathis, the person charged to have been murdered by the defendant. Upon this fact rests the entire case. It is the groundwork, the foundation of the prosecution, and without this primary fact being clearly established beyond any reasonable doubt, there can be no conviction for any grade of homicide in

this case, no matter how cogent may be the other facts proven against the defendant.

Our Penal Code contains this peremptory provision: "No person shall be convicted of any grade of homicide unless the body of the deceased, or portions of it, are found and sufficiently identified to establish the fact of killing." (Penal Code, Art. 549.) At common law, without this provision of our Code, a conviction for homicide would not be warranted until the death of the party charged to have been killed was clearly established, though there was evidence exhibiting satisfactory indications of the guilt of the accused. (*Wilson* v. *The State*, 41 Texas, 320; 3 Greenl., sec. 131; Stark. Ev., 862–863; 1 Bish. Crim. Proc., 1056; 2 Hale, 290; 1 Arch. Cr. Pl. and Pr., 798.) Mr. Wharton says: "The death should be distinctly proved, either by direct evidence of the fact, by inspection of the body, or by circumstantial evidence strong enough to leave no ground for reasonable doubt." (Whart. on Hom., 629, *et seq.*) At common law, however, it was not always essential, as it is under the provision of our Code, which we have cited, for the prosecution to produce and identify the body, or portions of it, of the person alleged to have been killed. (Whart. on Hom., sec. 630; 1 Bish. Crim. Proc., sec. 1057.) But it has always been required that the proof of the death should be clear and satisfactory beyond reasonable doubt, insomuch that not even the extra judicial confession of the accused that he had killed the person charged to have been killed would of itself, uncorroborated by other evidence of the death, be sufficient to warrant a conviction. (1 Bish. Crim. Proc., sec. 1058; Whart. Crim. Ev., 632.)

But, without further considering the subject as governed by the rules of the common law, we will look alone to the express provisions of our Code, by which we must be controlled in determining this question. There is no room to doubt the plain meaning of the provision cited. It requires an identification, by sufficient proof, of the dead body, or portions of it. It is indispensable that a dead body, or portions of a dead body, should be found, and equally as indispensable that, when found, it should be clearly proved to be the body, or portions of it, of the person alleged to have been killed. In the case before us, a portion of the skeleton of a human body was found.

In regard to this skeleton, and the finding of it, the evidence is substantially as follows: About the tenth day of August, 1882, it was found by a witness named Thomas, floating in the Brazos

river, at the town of Richmond, in Fort Bend county. It was floating down the river with the face down, the feet and back partly out of the water, so that witness could see that it was a human body. Witness pulled the body to the bank of the river by means of a rope. He describes it as follows: "I found that the head, one arm and the other hand were missing; that the body had on two pairs of pants, a pair of drawers, and shoes and socks, and that the upper portion of the body had on no clothes at all. When I dragged the body to the bank some one present raised the question as to whether the body was the body of a white or a black man, and I took a knife that I found in the pants pocket on the body, and split a hole in the clothing on the thigh, and found that it was the body of a white man. The body had on what I took to be ducking pants, over a pair of pants of different material, and the body, when I found it, had some mud on it, and the stomach, bowels and all the entrails were missing, and pretty much all the flesh. The clothes were sound, that is, not torn in any way."

A witness named Floyd buried the body, and he describes it thus: "The body had on two pairs of pants, a pair of drawers, and shoes and socks." This witness states that the body he buried was the same one that the witness Thomas took out of the river; that, two weeks after he buried it, Doctor Doyle hired him to dig it up, and Doctor Doyle took from it parts of the clothing, and one of the shoes and one of the socks, and that the socks were striped. Witness identified a shoe exhibited to him at the trial as the shoe that Doctor Doyle took from the body.

Doctor Doyle testified that about the twenty-fifth of August, 1882, he employed the witness Floyd to exhume a dead body at Richmond, Texas; that the body was without a head or neck; one arm and the shoulder blade of the arm, and the hand from the other arm, were gone; the flesh was all gone from the ribs and body; there was nothing but some tendons about the ribs, but no muscle or flesh, and none in the pants but some corrupt, decayed matter. The body had on two pairs of pants, but no suspenders; the outer pair of pants were of coarse cassimere, woolen, and their color was gray; the under pair of pants were of checked tweeds. The body also had on a pair of ordinary brown drilling drawers; also a pair of ordinary kip shoes, not heavy. Witness cut off a portion of the legs of each of the pairs of pants, and brought them away with him; also one of the shoes

and one of the socks on the body; the sock was a cotton sock with red stripes two or more inches in breadth around the top of the sock, and the foot of the sock was red. Witness also exhibited a buckhorn handled two bladed knife, larger than medium size, which he stated was taken from the body.

We have recited all the testimony descriptive of the dead body found, and the clothing upon it. It is claimed by the prosecution that this skeleton was the remains of W. B. Mathis, who, it is alleged, was murdered by the defendant, in Hood county, on the twenty-eighth day of April, 1882, about four months prior to the time of the finding of this skeleton.

We will now examine the evidence as to the identification of the skeleton found as being that of the alleged murdered man, W. B. Mathis. It is claimed by the State that the defendant murdered Mathis on the night of the twenty-eighth of April, 1882, in Hood county, within a half mile of the Brazos river, and threw the body of deceased into the river, and that the body was carried by the waters of the river to the place where it was found by the witness Thomas, which is proved to be between six and nine hundred miles distant, by the meanderings of the river, from the place where the murder is alleged to have been committed. If the theory of the prosecution is correct, the body had been conveyed by the river a distance of at least six hundred miles, and was found in the condition it was shown to be in, some four months after the murder. While it is not impossible that the body may have made this long and difficult journey, it is shown by the testimony of two physicians that it was not probable. Doctor Doyle testified "that it was possible that a dead body might float from the one point to the other, but that it was not at all probable." Doctor Lancaster testified that such a thing would be *possible* but not *probable.*

Thus, we see, the theory of the prosecution, to start with, is based upon an *improbability,* and hence it is all the more essential that the proof should be clear and convincing that the skeleton found was that of W. B. Mathis. There is no direct evidence establishing it as such.

What are the circumstances relied upon by the State as identifying the skeleton as being that of Mathis? First, that on the night of the twenty-eighth of April, 1882, W. B. Mathis, who was living at the house of defendant's father, in Hood county, mysteriously disappeared, and has not since been seen or heard from. It is not to be denied that the circumstances in evidence

are strongly in favor of the assumption that W. B. Mathis came to his death on the night of the twenty-eighth of April, 1882. His mere disappearance, however, and his not being seen or heard from since, while sufficient to create a presumption that he no longer lives, are far from sufficient to warrant the conclusion that he is certainly dead. He was a young man, not long in this State, a laboring man, and with no family or ties of any kind to cause him to remain in any particular locality, and he might have left his temporary residence and wandered to some distant place, and be yet living. Instances of such disappearances, unaccountable at the time, have often occurred, and years afterward the persons believed to be dead have been found to be still living. But the mysterious disappearance of Mathis, while of itself wholly insufficient to establish the fact of his death, is nevertheless a circumstance tending to prove that fact, and tending also, although in a remote degree, to identify the skeleton found as his remains.

Second. The defendant was in possession of property which belonged to Mathis, soon after the disappearance of the latter, and claimed this property as his own. This fact and many other suspicious acts, declarations, writings and conduct of the defendant, subsequent to the disappearance of Mathis, are claimed as circumstances which not only show that the defendant murdered Mathis, but also tend to identify the skeleton found as that of the murdered man. While such evidence may be perfectly legitimate for the purpose of identification, as well as for the purpose of connecting the defendant with the crime, the fact still remains to be proved by other evidence than this that the remains found were beyond a reasonable doubt the remains of W. B. Mathis.

Third. It is contended by the State that the remains found are identified as those of Mathis by the clothing, etc., upon the same. Let us examine the testimony upon this point. 1. As to the pants: The skeleton had on, when found, two pairs of pants. Witness Thomas, who found the remains, states: "The body, when I found it, had on what I took to be ducking pants, over a pair of pants of different material." Witness Floyd, who buried and afterwards exhumed the remains, does not describe the pants. Witness Doctor Doyle, who had the body exhumed, and who preserved a portion of the pants, says: "The outer pair of pants were a coarse cassimere, woolen, of a gray color; the under pair were checked tweeds." Henry Jones testified

that he saw W. B. Mathis about sundown of the day on which he disappeared, April 28, 1882; that he then had on a pair of *ducking* pants of the same kind which witness, at the time of testifying, had on, and which were brown cotton ducking. This witness, while testifying, was shown the pieces of pants taken from the body by Doctor Doyle, and testified in regard thereto that he had not seen them before.

It is contended by the State that there is a conflict of evidence in regard to the pants. We do not think so. The witness Thomas does not state positively that the outer pair of pants found upon the remains were of *ducking*, but only that he "took it to be" ducking. Doctor Doyle states positively that the material of this outer pair of pants was *coarse cassimere, woolen,* of a gray color, and he not only states this, but produces in court a portion of the pants, demonstrating that the material was cassimere and not ducking. We are therefore forced to the conclusion that the outer pants found upon the remains were not made of *cotton ducking*, and yet the State's witness, Jones, who last saw Mathis, and who saw him on the very evening of his disappearance, is positive that he then had on *cotton ducking* pants, and not *cassimere* pants, such as were found upon the remains. It cannot be said, therefore, that the outer pants identify the remains as those of Mathis. And as to the other pair of pants found upon the remains, there is no evidence whatever to prove that they belonged to Mathis.

2. As to the brown cotton drawers found upon the remains, there is no proof that Mathis ever had such drawers. His brother testified on the trial that W. B. Mathis had very few clothes; that he bought one pair of cotton flannel drawers after he came to Texas; but he says nothing about his having such drawers as were found upon the remains.

3. As to the shoes, those found upon the remains were ordinary kip shoes, not heavy, and number ten in size. It was proved that W. B. Mathis wore number ten shoes, and the witness Jones, who last saw Mathis, said that he then had on shoes similar to the shoe taken from the remains by Doctor Doyle. Upon this point Jones testified as follows: "The shoes were of the same kind as the shoe exhibited to me; that is, they look like the same shoe shown me. I cannot say that this is the same shoe. The shoes were of the same kind as this one; that is, they, as this shoe is, were of the kind that tied with a string, not gaiters or button shoes." This is all the evidence which tends

to prove that the shoes upon the remains were the shoes of W. B. Mathis. All that it proves is that Mathis wore shoes, when last seen, of the same quality, make and number as those found upon the dead body, and it is safe to say that at that same date there were five hundred other men in Texas who were wearing shoes in all respects similar to those.

4. As to the socks: The socks found upon the remains were *striped cotton* socks, with red feet. It is not shown that Mathis had such socks. It was proved by his brother that, when he last saw W. B. Mathis, he had some *white woolen* home made socks. This is all the evidence we have in relation to the socks.

5. As to the knife: There is no evidence identifying the knife found as one belonging to W. B. Mathis. We have now noticed in detail all the evidence of identification afforded by the remains, and we must say that it is not only insufficient to identify the remains found as those of W. B. Mathis, but that, to our minds, it leads to a contrary belief. We are not even informed by the evidence as to the height, size and weight of W. B. Mathis, and as to the height, size and probable weight of the person whose skeleton was found. These facts could certainly have been ascertained and proved, and would have weight in determining the question of identity. An anatomist could ascertain from the skeleton found, almost, if not precisely, the height, size and weight of the individual while living, and would also detect, if it existed, any peculiarity in the conformation of the bones of the body, such as a formerly fractured bone, a misshapen hand, foot, arm, leg, etc., and which peculiarity, if discovered, might lead to the certain identification of the remains. But no effort whatever seems to have been made on the part of the prosecution to adduce any proof of this character, and no reason is assigned why the effort was not made. Doctor Doyle, who testifies that he is a physician, must be presumed to have a knowledge of human anatomy, and he examined the skeleton in question, yet we are not even told by him what was the size, height, sex or race of the individual who once animated it. (*Wilson* v. *The State*, 41 Texas, 320; same case, 43 Texas, 472.)

Fourth. It is claimed that a circumstance of identification exists in the fact that the remains, when found, had on no shirt. It was proved that on the twelfth of August, 1882, two shirts were found hidden in the brush on the premises where Mathis is alleged to have been murdered. These shirts were badly mildewed and were quite rotten. They were exhibited in

court on the trial, and J. C. Mathis, the brother of the alleged murdered man, testified in regard to them as follows: " I recognize the shirt exhibited to me as being exactly like one which I knew my brother had when he was at Doctor Walker's. My mother made it for him for an undershirt before we left home. It is a home made undershirt. The shirt was small for my brother. The other shirt I know nothing about." This is all the evidence relating to the shirts. It by no means proves that these garments belonged to Mathis, nor that they were placed where found by the defendant. It certainly does not prove that they had ever clothed the body the remains of which were found more than six hundred miles distant from where the shirts were found.

After a most careful and thorough consideration of all the evidence in the record, we are compelled to say that, in our judgment, the State failed to prove in the first place that W. B. Mathis is dead, and, in the second place, if in fact he is dead, that the remains found were his. Were it necessary, we could cite many cases stronger in their facts in proof of the *corpus delicti* than the one before us, where it has been held that the evidence of the death and of the identification of the body were insufficient to warrant a conviction of homicide.

Counsel for defendant, in argument, presented a most important question, which it is not necessary to a disposition of this case that we should definitely determine. We have not had the opportunity to investigate the authorities, if any, which may bear upon it, and we shall go no further at present than merely to call attention to it, leaving its final determination for the future, should the question ever present itself in such a shape as to demand a decisive solution. It is contended that the provision of the Penal Code, Article 549, which we have before quoted, requires not only that the body, or portions of it, shall be identified as that of the alleged murdered man, but that it shall be identified so as to establish the fact of *killing;* that is, that the body, or the portions of it found and identified, must exhibit evidence sufficient to prove that the individual was *killed;* that is, that the death was produced by violence and not by natural causes.

Because, in our opinion, the evidence does not identify the body of the alleged murdered man, and does not establish clearly his death, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered October 27, 1883.