[No. 1644.]

## EX PARTE MONROE COLDIRON AND BRINK FAVORS.

1. RIGHT OF BAIL.—The Bill of Rights, Section 11, provides: "All prisoners shall be bailable by sufficient sureties, unless for capital offenses, when the proof is evident." This provision secures the right of bail to all persons accused of crime, except in cases where the facts show with reasonable certainty that the accused is guilty of a capital offense.

2. SAME—EVIDENCE—Bail is not a matter of right when the evidence, whether direct or circumstantial, is clear and strong, leading a well guarded and dispassionate judgment to the conclusion that the offense has been committed; that the accused is the guilty agent, and that, if the law be administered, capital punishment will be inflicted.

3. SAME.—The transcript in *habeas corpus* cases for bail should show the pecuniary circumstances of the applicant, so as to enable this court, if it allows bail, to act intelligently in fixing the amount.

4. FACT CASE.—Note the proof upon which the appellants are *held* entitled to bail in this case.

HABEAS CORPUS on appeal from a judgment in chambers rendered by the Hon. T. L. Nugent, judge of the thirtieth judicial district, refusing the applicants bail.

The relators were held under a mittimus issued by a justice of the peace of Erath county, presiding at their examining trial upon the charge of the murder of Frank Trout.

This proceeding was had upon the written testimony taken before the justice of the peace on the examining trial, the counsel for the State and for the defense having authorized the same in writing.

The testimony of J. P. Floyd, a witness for the State, was the first read. He testified in substance, that at the present time and for the last eight years, he had lived in Comanche county, Texas. He had occupied his present residence, near the county line, about twelve months. Witness was acquainted with the relator Coldiron, and knew the relator Favors by sight. Witness, on the thirtieth day of December, 1883, was acquainted with a man named Frank Trout, who lived about a mile southeast from the witness, in Comanche county. Witness saw the deceased, Frank Trout, on the night of December 30, 1883. He came to witness's house a short time after dark on that night.

Trout remained at the witness's house about two hours, and then left, going toward his home. Fifteen minutes later witness saw him about seventy yards from the house. Trout had called to witness, and, when witness got to him, he told witness that he was shot all in pieces, and asked witness to assist him to witness's house. Mr. Adams and Mr. Williams came up and assisted witness in taking Trout to his, witness's, house.

When the doctors arrived, the witness saw the wound on Trout's person. It was a wound inflicted, to the best of witness's belief, by a shot gun. The shot took effect in the right breast, just under the nipple, and it was a bad wound, making a large hole. The deceased was also shot in one of the thighs. As near as the witness was able to state, the shooting was done at about eight or nine o'clock on the night of December 30, 1883. The deceased lived until about daylight next morning, when he died from the effects of the wound.

When the witness reached the deceased just after the shooting, the deceased was in his right mind. He said that his death was inevitable before sunrise next morning, and that he had no hopes of surviving his wound. Here the witness avowed that all the statements made to him on that occasion by the deceased were voluntary on his part and not made in reply to questions or persuasion. He then proceeded to testify, in substance, that when he reached the deceased, and after the preliminary statements already quoted had been made by the deceased, the deceased proceeded to say that he did not know who shot him unless the parties, of whom there were two, were Broadfoot and Jim Warren, as he did not think he had any enemies in this country. The deceased stated to the witness that, when he reached the forks of the road about three hundred yards from the witness's house, on his way home, he saw two men near a tree which stood at or about the fork. They demanded his name, and deceased responded, "Frank Trout." They then said that they would kill the deceased, and fired upon him with a shot gun. He told the witness that the man who did the shooting was small of stature. The two men were riding dark colored horses.

Witness saw the relators, Coldiron and Favors, on the day of the killing, at about sunset. They came to witness's house that evening late, one of them riding an iron gray horse. Witness could not remember the color or style of the horse ridden by the other party. They left the house of the witness about dark that

evening. On Christmas day preceding, the relator Coldiron told the witness that he was going to whip Trout or take a whipping himself. Coldiron's feelings toward the deceased were not kindly. The killing occurred in Erath county, on the night of December 30, 1883.

Cross-examined, the witness testified that he had been acquainted with the relators but a short time, but had known the deceased about nine years. He supposed that the deceased was acquainted with each of the relators. Witness had Coldiron's little eight year old girl at his house, whom Coldiron frequently came to see. Coldiron had no wife. Witness did not know from which direction the relators came to his house. When they left, they went in a northwest direction from witness's house. Coldiron earned his livelihood by working for different parties. The relators had been gone some thirty minutes when the deceased reached the witness's house. He came to go to church, remained about two hours, and left to go home, taking a southeast direction, which was the proper course. He had been gone some ten or fifteen minutes when the witness heard him cry out, and heard the firing of the guns. Broadfoot lives in Fannin county. Witness did not know the residence of Jim Warren. The deceased told him that he had had some trouble with his own and Broadfoot's wife, and he did not know who shot him unless it was Broadfoot and Warren. He told the witness that the horses ridden by the men who shot him appeared to be blacks or bays. The distance between the houses of the witness and Favors is between five and six miles.

Re-examined, the witness stated that the deceased could not see well by night. The deceased lived about a mile distant from the witness. Jack Ward lived between the houses of witness and deceased. The relator Coldiron usually rode a small bay pony. Witness heard six or seven shots from the direction of the point where deceased was shot.

The next witness for the State was M. C. Turnbough. He testified, in substance, that he lived in Erath county, in a southerly direction from Stephensville, and about a mile and a half distant from the house of the witness J. P. Floyd. Witness heard the reports of the guns at the time that the deceased was shot, and reached the deceased about thirty minutes after the shooting occurred. The deceased, when the witness saw him, December 30, 1883, was at the house of J. P. Floyd. He examined the deceased and found him shot in the left breast. The wounds

had the appearance of having been inflicted with a shotgun. Deceased told the witness that he had started home from Floyd's house, when he met two men at the forks of the road. They asked him who he was and he answered "Trout." They asked what Trout, and he replied "Frank Trout;" whereupon they fired upon him. He stated to witness that one of the men was of small stature; the other somewhat larger. He also told the witness that the men were riding dark colored horses, as near as he could tell. The witness, Mr. Hester and Mr. Kelly went to the forks of the road where the shooting occurred, next morning about one hour after sunrise. They were the first parties on the ground that morning. They found the tracks of two men, seven or eight in size, one a fraction larger than the other. They found also the tracks of two different horses; one was the track of an unshod pony, the other the track of a larger horse, shod all round. Leaving the place where the shooting occurred, the tracks of the horses led in a northeasterly direction. Witness trailed them about two miles. When he last saw them on that morning, they were leading in the direction of the house of the relator Favors, who lived about five miles distant from the place of the shooting.

A "furrow" run in a southeast course from Floyd's house. The witness trailed two horses by their tracks over this furrow going in the direction of Floyd's house. One was the track of a large horse, shod all round; the other the track of an unshod pony. Witness and Mr. Huckabee measured the tracks found at the place of the shooting and also the tracks on the furrow. The measures corresponded and the tracks were the same in appearance. They looked fresh and were apparently made on the night before, which was the night of December 30, 1883. The tracks at the tree in the forks of the road looked quite as fresh as those in the furrow. There was a visible peculiarity in the tracks of both horses. The track of the large horse indicated that he moved with a kind of twist in one of his hind legs. The feet of the pony dug out the ground in movement. Some time after the death of Trout, the witness saw a pony ridden by one of Favors's boys, which was said to belong to Coldiron. He observed his track. It was similar and looked very much like the pony track in the furrow and at the forks of the road. Witness saw no other tracks than those described, either at the forks of the road or in the furrow.

Cross-examined, the witness said that at the time of the shoot-

ing he was at the house of Jim Baker, about three-fourths of a mile distant from the forks of the road. Witness heard the shooting. Several shots were fired in rapid succession. Witness went to the deceased immediately. He asked deceased if he knew who shot him. Deceased replied that he did not. Witness then asked him if the parties spoke in a natural tone of voice, and he replied that they did. He further said to witness that he would like to know why he was shot, as he knew of no enemies he had save Broadfoot and Warren, who did not live in that section of country. The horses came to the place of the shooting through the woods, and not over the road. The witness and his party trailed first from the place where Trout was shot, measuring the tracks there first. They proceeded some fifty or sixty yards and returned to the shooting ground, and found another track (the second one) coming from a southerly direction. It was the only track which came to the shooting ground from that direction, and corresponded perfectly with the large horse track at the shooting ground. The party then went back to Mr. Floyd's house.

About ten o'clock on that morning they returned to the shooting ground and took the back track of the horses, and trailed them coming east and going west. They followed the tracks until they intersected the trail going east; thence to the school house, where they quit it. Witness saw other tracks along the road besides these. For the first half mile from where Trout was shot the tracks led through the woods. The ground thus far was covered with grass and leaves, but it was loose sandy land. The furrow was an old one, some fifteen inches wide, and was used apparently by cattle. The tracks of the horses in some places were half of the foot deep, and in other places the depth of the shoe. Witness could measure these tracks accurately through the sand. The tracks in the furrow were very plain. It was, the way that the trail went, two miles from the place of the killing to the school house. The first trail witness took went to the place of the killing from or about John Warren's place, a half mile distant, through the woods. This John Warren was a brother of the man mentioned by the deceased as his enemy. A load of turkey shot was found in the tree at the forks of the road where the deceased was fired upon. Witness found some wadding on the ground near by, which evidently had been fired from a shotgun. Other wadding was found some fifteen or twenty feet from the tree. A pistol ball was also

found in the ground near the tree, where it had been fired. It was a forty-four calibre.

The re-examination of the witness was directed to a description of the route taken by the parties who did the shooting, as indicated by the tracks. His statement was as follows: "The next morning after the shooting we went to the place where Trout was shot, and took a track that was going in an east direction. That was the pony track. We tracked it about sixty yards. Then we returned to the shooting ground and found another track coming from a south direction to the place of shooting. That was a large track, shod all around. We tracked it back to John Warren's lot, and then quit it. We then took the road from John Warren's house to Jack Ward's, which was in rather a northeast direction. When we came to the forks of the road from which one road led to Trout's house, we saw tracks that seemed to have come from Warren's lot to the place of shooting. We there (at the place of shooting) took the back track of the two horses, and tracked them about two miles, going by Jack Ward's thence up the road from Ward's to the school house, in about a northeast direction. We trailed the tracks in the furrow by running them back near the road which runs by Jack Ward's house. Those tracks that we back-tracked in the furrow were exactly the same tracks that we followed from the shooting ground going in the direction of the school house—that is, they measured the same, and were the same in appearance."

Re-crossed: " We did not trail the track that we back-tracked from the shooting ground to Warren's house, further than Warren's house. It was the track of the large horse that we trailed to Warren's house. I think we trailed the horses from Floyd's house for about two hundred yards. We lost sight of the trail in the furrow near the road."

J. C. Elliott testified, for the State, that on December 30, 1883, he lived in Comanche county, about a half mile south of John Highley's house, and about one mile distant from Trout's, and two miles distant from Floyd's. He saw the relators about twelve o'clock on that day, when they passed his house going south. Coldiron was riding a small bay pony, and Favors a tolerably large iron gray horse. Witness exchanged some words of conversation with them. He told them that he had borrowed a good little shot gun, which he desired to trade. Favors told witness, in reply, to go to his house and he would trade witness

a shot gun. The witness saw the same two parties, riding the same horses, late that evening, about a half hour by sun perhaps, going in a north direction, towards John Highley's. They were traveling the neighborhood road, which ran by witness's place to and by Highley's.

John Highley testified, for the State, that on December 30, 1883, he lived in Comanche county, about a half mile from Elliott's house, three hundred yards from Odom's, and about a mile from Trout's house. Witness saw the relators on the evening of December 30, 1883, about a half hour before sundown. They passed witness's house, going towards Trout's; Coldiron was riding a small bay pony, and Favors a large dark iron gray horse.

Purvis and Huckabee, respecting the horse tracks, course, etc., testified, for the State, substantially as did the witness Turnbough.

B. F. Rosser was the next witness for the State. He testified that he saw the relator Favors at his house on the Sunday before the killing of Trout. He saw also at the same time and place a dark iron gray horse that Favors claimed to own. He saw Favors take up the horse's feet to inspect them, and particularly noticed that the horse was shod all round. The hind shoes had corks. Witness did not notice that the front feet had corks. He advised Favors to permit the shoes to remain on the horse, as they appeared to be new.

J. P. Floyd, recalled for the State, testified that Coldiron told him, on the Sunday night previous to the killing, that, in consequence of what his little girl told him of Trout's conduct towards her, he intended to whip Trout, or take a whipping from him. He afterwards told witness that he would drop the matter.

J. W. Turnbough testified, for the State, that he arrested Coldiron near the town of Alexander, about one week after the killing of Trout. He had a forty-four calibre British bulldog five shooting pistol on his person, when arrested. Witness saw the dark iron gray Favors horse on the Monday after the killing. The horse was then shod in front, but not behind. The hind shoes had evidently been removed within the last two days.

M. C. Turnbough testified that he saw the small bay pony said to belong to Coldiron, about a week after the killing. It was unshod.

John Highley testified, for the State, that about a week before the killing, Mack Kennedy came to his house and asked him if

he had heard the reports concerning Trout and Coldiron's little girl, then in circulation. He replied that he had not. Kennedy then repeated the reports and said that if true they would take Trout out and give him a whipping. Witness told him that the reports were thin. Thereupon Kennedy said they would drop the matter, and left, going to a crowd of men some two hundred and fifty yards off. The crowd stood there, talking boisterously for some few minutes, and finally left, shooting off pistols. Kennedy appeared satisfied when witness told him that the reports about Coldiron's girl and Trout were "thin."

J. M. Kennedy, for the State, admitted that he had a conversation with Highley at his house, about the reports concerning Trout and Coldiron's little girl, but did not remember that he said they would whip Trout if they were true. Coldiron was with the crowd near Highley's house, at that time.

Sheriff Galbraith testified that Coldiron was about five feet, nine inches high, and weighed about one hundred and forty-five pounds; Favors was about two inches lower and weighed about one hundred and fifteen pounds. The two relators wore the same sized shoes, about number sevens.

Miss Nellie Trout, daughter of the deceased, testified that she lived with the deceased at the time of his death. He lived then about a mile from Floyd's, and about one hundred yards from Jack Ward's. Witness saw the relator Coldiron on the evening of the shooting, about sundown. He, in company with another man, rode past Trout's house, going in the direction of Jack Ward's. Coldiron rode a small bay pony; the other man a large speckled gray horse. Coldiron kept looking back toward the house for some distance after passing it. Ward's house was also in the direction of Floyd's.

Sheriff Galbraith testified that the pistol ball found on the shooting ground was a forty-four calibre, and an exact fit to the pistol taken from Coldiron.

No briefs for relators have reached the Reporters.

J. H. Burts, Assistant Attorney General, for the State.

Willson, Judge. "All prisoners shall be bailable by sufficient sureties, unless for capital offenses when the proof is evident." (Bill of Rights, sec. 11.) This secures the right of bail to all persons accused of crime, except in cases where the

facts show with reasonable certainty that the accused is guilty of a capital crime. (*McCoy* v. *The State*, 25 Texas, 33.) If the evidence, whether direct or circumstantial, is clear and strong, leading a well guarded and dispassionate judgment to the conclusion that the offense has been committed; that the accused is the guilty agent; and that he would probably be punished capitally if the law is administered, bail is not a matter of right. (*Ex parte Cook*, 2 Texas Ct. App., 388; *Ex parte Foster*, 5 Texas Ct. App., 625.)

In this case, after a very close examination of the evidence, we are of the opinion that the applicants are entitled to bail. We do not regard the proof as evident, within the meaning of the provision of the Bill of Rights above quoted. It would not be proper for us to comment upon the evidence, and show wherein, in our judgment, it is insufficient to warrant the denial of bail.

We are again placed under the necessity of fixing the amount of bail without the aid of any proof whatever as to the pecuniary circumstances of the applicants. We have several times called attention to the impropriety and disadvantage of a failure to make such proof, and incorporate the same in the record. It is impossible for this court, in the absence of such proof, to intelligently and justly fix the amount of bail. In doing so we are, to a great extent, engaging in guess work.

In this case, our only guide for determining the amount of bail is the nature of the offense and the circumstances under which it was committed, having in view the constitutional provision that excessive bail should not be required. With the lights before us, we fix the amount of bail at the sum of five thousand dollars, for each of the applicants. If the applicants are men of means, this bail is by no means excessive. If they are poor men, it may be excessive, but, if so, applicants have no cause to complain, because they have failed to present to this court any proof as to their pecuniary condition.

It is ordered that the judgment of the judge denying the applicants bail be reversed, and that the said applicants are each entitled to bail, and that the amount of such bail is fixed at five thousand dollars for each of said applicants, and that, upon giving bail in said amounts, in accordance with the law in such cases made and provided, said applicants be discharged from custody.

*Ordered accordingly.*