CORNELIUS McCOY V. THE STATE.

The terms "proof is evident or presumption great," as used in the 9th section of the Bill of Rights, are intended to indicate the same degree of certainty, whether the evidence be direct or circumstantial. The design is to secure the right of bail in all cases, except in those in which the facts might show, with reasonable certainty, that the prisoner is guilty of a capital offence.

"Express malice," one of the essential elements of murder in the first degree, not being defined by the Penal Code, resort must be had to the common law to determine its meaning.

The definition given in Blackstone's Commentaries, "that express malice is, when one with a sedate and deliberate mind, and formed design, doth kill another; which formed design is evidenced by external circumstances discovering that inward intention, as laying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm," is adopted as correct. See the opinion in this case for an analysis and exposition of the elements of the definition.

A. attacking B. with malice, shoots at him, but misses him and kills C., against whom he bore no malice, at common law is murder; but how far this instance may be modified by the provision of our Code, Art. 49, *quære?*

The object of the proof is to establish the existence of the malice in fact, towards the deceased, at the time of the killing, which prompted the accused to the commission of the deed. The sufficiency of the evidence to establish it is determined, as that of any other fact, by its effect to reasonably satisfy the mind.

In determining whether murder has been committed with express malice or or not, the important questions are: Do the external facts and circumstances at the time of the killing, before or after that time, having connection with, or relative to it, furnish satisfactory evidence of the existence of a sedate, deliberate mind on the part of the person killing at the time he does the act? Do they show a formed design to take the life of the person slain, or do him some serious bodily harm, which, in its necessary or probable consequences, may end in his death; or such general reckless disregard of human life as necessarily includes a formed design against the life of the person slain? If they do, the killing, if it amount to murder, will be upon express malice.

The external circumstances indicating the design, may transpire at the time of the killing, as well as before that time.

In a case where there are facts, some of which tend to establish the existence of express, and others of implied malice, where fresh provocation intervenes between the preconceived malice and the death, it will not be pre-

3Y

sumed that the killing was upon the antecedent malice; and although it will not be *presumed*, it may be *proved* to have actuated the person in the killing by the circumstances and facts in the case, notwithstandirg the fresh provocation.

APPEAL from Gonzales on a writ of *habeas corpus* granted by the Hon. Fielding Jones, and tried before him on the application of the prisoner for bail, after indictment found.

Indictment for the murder of David Baltzell, in the County of Gonzales, A. D. 1859. The facts disclosed by the record showed that the prisoner, in the evening, about three-quarters of an hour previous to the killing, had been playing billiards in a house adjoining the hotel, known as the Keyser House. About sunset the party walked out on the pavement in front of the hotel, there being present about fifteen persons. In reply to a remark made by some one present, McCoy remarked, "that was the way my friend Dr. Brantley was killed here; that he had been here since yesterday evening, and intended remaining until the next evening; he had not been near that corner, (pointing to Monroe's store,) and did not intend to go there, for the reason that he did not want any of them to speak to him, and if they did, he would spit in their damned faces, and then they could murder him as they had his friend Dr. Brantley." After a pause, he remarked aloud that "if they had any friends present, he wanted them to go and tell them not to come about him." It was also proved that McCoy, in his remarks on the street, had also said that "the Monroes were damned cowards and damned murderers, that he could whip any of them; that they and the Baltzells had murdered his friend; and that he would rather lie in Brantley's grave than to speak to them." And concluded by adding, "that he was there, and if Monroe had any friends, they could go and tell them what he said."

Shortly afterwards, William Baltzell came up with one Logan, who had invited him and his brother, David Baltzell, to sup with him, which invitation was declined by the latter, and entered the hotel. Information was communicated to David Baltzell that probably there would be a difficulty at the hotel. When William Baltzell and Logan came up, one Brantley, who was sitting on a

bench by the side of the door, got up and looked after Baltzell; and McCoy, who had been walking around, stepped to the door, when Brantley made a motion or sign towards Baltzell by nodding his head.

David Baltzell was seen to have a double-barrelled shot gun about ten or fifteen minutes before the difficulty, and going toward the hotel. McCoy, Hardy, Gibson, Blakely and Brantley were in front of the hotel. Hardy was seen with a six-shooter during the evening. When William Baltzell and Logan entered the hotel, Brantley asked one of the witnesses with whom he was conversing who it was with Baltzell; to which the witness replied that he did not know. Brantley then walked to where McCoy and Davis were, and either Brantly or Davis remarked, "that's him now," and looked in the door after them. McCoy and Brantley then went into the office, and opened the lid of a desk.

The witness started to go into the office, and was stopped by some one unknown to him, who said that Mr. McCoy was having a private conversation with a gentleman and that he could not go in.

William Baltzell and Logan proceeded to the supper room; the latter remarked he had supped once before. It was proved that the Baltzells had not been in the habit of going to the Keyser House since their affair with Dr. Brantley. Logan testified that when he insisted on Baltzell's going to supper, David said to William that he had better look out down there, as he might get into a difficulty, and gave him (the witness) some arms, for fear one might occur. William Baltzell testified that Logan (who was not sober) before starting to supper asked him for arms, and that he gave him a pistol, as did also his brother, David Baltzell. He stated that he himself was in the habit of going armed at the time; that Logan was an old friend with whom he went to sup, without apprehending a difficulty, and was himself perfectly sober on the occasion. He also stated that he knew McCoy was in town, but did not know he had any particular place of staying; knew him when he saw him. That he had his pistol, all the barrels of which were loaded and capped. When they entered the supper room, no one was at the table except the landlord and his

wife, and another gentleman. It is to be inferred from the facts that the guests or boarders had supped. William Laird, a witness for the defendant, stated that thinking there would be a difficulty he spoke to McCoy and asked him to go with him and get a cigar, which offer was declined in a manner which was rather repulsive. The witness walked back, and met David Baltzell, who was standing by the last post of the portico, who asked him if he thought there would be a difficulty. Witness replied that he was fearful there would be, from what he had heard McCoy say in the evening, and told him what he had heard. To which he replied, that if the difficulty came up he would see it out. He then had in his hand a pistol, which was cocked.

Just then McCoy, who was standing at the door of the hotel, advanced a few steps in the hall. William Baltzell addressed him as "Mr. McCoy." At that time David Baltzell ran to the door. McCoy, addressing himself to William Baltzell, said, "this is Mr. Baltzell, is it?" Was answered "yes." McCoy then said "Billy Baltzell?" and was answered as before. David had then got to the door. The witness, Laird, saw McCoy have his hand raised, holding in it, as he supposed, a pistol, in the attitude of striking, and William Baltzell was drawing his pistol. McCoy said, "Don't you speak to me, you damned murderer," and just then (as the witness thought) William Baltzell fired, and McCoy struck, and just about the same time David Baltzell fired at McCoy from behind, and was unseen by the latter. The witness was probably mistaken as to *the firing* of the pistol by William Baltzell. The cap exploded without firing, and none of the loads of his pistol were discharged.

William Baltzell was stunned by the blow, and on recovering from it sufficiently retreated through the dining-room. A struggle ensued between McCoy and David Baltzell; the crowd escaped out of the room, and no eye witness testifies further than that during the short struggle another pistol was fired, some one fell, McCoy walked out with what a witness supposed to be a pistol in his hand, and David Baltzell was found dead, shot in the forehead by a large ball. A deringer pistol was lying near him on the floor; a slung-shot or colt was also picked up. About the

wound were marks of powder burn. Hardy and Gibson went into the hall after the firing of the last pistol, and came out with McCoy, and they went off together. It was not shown where McCoy lived, what his business was there, who came with him, who were his associates, except as shown when the difficulty took place, nor that any one else took part in the fight besides the prisoner and the two Baltzells.

The district judge refused to allow bail to the prisoner, because it was the opinion of that court that the offence is not of a character that will, under the laws of Texas, admit of the privilege of bail.

*Parker & Miller*, for the appellant.

*Attorney-General*, for the appellee.

ROBERTS, J.—Appellant was indicted in the District Court of Gonzales county, for the murder of David Baltzell; and having been brought before the district judge upon a writ of *habeas corpus*, and the evidence having been heard, it was decided that he was not entitled to bail; and from that decision an appeal was taken to this court.

The main question in the case is, whether or not the killing was upon express malice.

The amendment to the code established degrees in murder by the following provisions, to wit:

"Art. 608. All murder committed by poison, starving, torture, or with express malice, or committed in the perpetration, or in the attempt at the perpetration of arson, rape, robbery, or burglary, is murder in the first degree, and all murder not of the first degree is murder of the second degree."

"Art. 612a. The punishment of murder in the first degree shall be death, and the punishment of murder in the second degree shall be confinement in the penitentiary for not less than five years." (O. & W. Dig., 534.)

By the 9th section of the Bill of Rights in the constitution of the State of Texas, it is provided that "all prisoners shall be bailable

by sufficient sureties, unless for capital offences, when the proof is evident or presumption great." (O & W. Dig., 14.)

The terms "proof is evident or presumption great," are as definite to the legal mind, as any words of explanation could make them; and are intended to indicate the same degree of certainty, whether the evidence be direct or circumstantial. The design is to secure the right of bail in all cases, except in those in which the facts might show, with reasonable certainty, that the prisoner is guilty of a capital offence.

The Code does not define what is meant by "express malice." But it is provided that "the principles of the common law shall be the rule of construction, when not in conflict with the Penal Code or Code of Criminal Procedure, or with some other written statute of the State." (Art. 4, P. C., O. & W. Dig., 458.) Recourse must, therefore, be had to the common law authorities, for the meaning of the term "express malice."

In every indictment for murder, the prisoner is charged with having, with malice aforethought, killed the deceased. The proof to sustain this charge under the law may or may not exhibit deliberate malevolence in the mind of the prisoner towards the person killed, though that may be the literal import of the charge in the ordinary acceptation of the terms used. Hence, malice aforethought, when attempted to be defined, has been necessarily given a more comprehensive meaning than enmity or ill-will or revenge; and has been extended so as to include all those states of the mind under which the killing of a person takes place, without any cause which will, in law, justify, excuse, or extenuate the homicide. (Rex v. Harvey, 2 B. & C., 268; 1 Hawkins, 95; 1 Russell, 482; Penal Code, Art. 607.)

Hence, also, has originated the distinction between malice express and implied. The most complete and accurate view of the distinction between express and implied malice is to be found in Blackstone's Commentaries; which, it is believed, will be the better understood and appreciated, in proportion to the research into other sources of information.

"Express malice is when one with a sedate, deliberate mind, and formed design, doth kill another: which formed design is

evidenced by external circumstances, discovering that inward intention, as laying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm." (4 Blackstone's Com., 198.)

This description indicates, 1st, the state of the mind at the time of the killing; 2d, the design formed; and 3d, the character of proof by which such formed design is to be discovered.

1. The person must be of sedate, deliberate mind. He must be sufficiently self-possessed as to comprehend and contemplate the consequences of his acts. His acts must not be the result of a sudden, rash, inconsiderate impulse or passion. This, when there was an intention to kill, might still be murder, but not upon express malice. Hence, it is said, "if a man kills another suddenly without any or without a considerable provocation, the law implies malice." (4 Bl. Com., 200; Hale P. C., 455–6; 1 Russell, 483; Atkinson v. The State, 20 Tex. R., 530–1; Mitchell v. The State, 5 Yerg., 340.)

2. The design formed must be to kill the deceased, or inflict some serious bodily harm upon him. This would indicate that the malevolence must be directed towards the deceased as its object.

Mr. Hawkins says, that is most properly called express malice, when murder "is occasioned through an express purpose to do some personal injury to him who is slain in particular." (1 Hawk. P. C., 96.)

"Malice in fact (express) is a deliberate intention of doing some corporal harm to the person of another." (1 Hale P. C., 451.)

This design "is not confined to an intention to take away the life of the deceased, but includes an intent to do any unlawful act, which may probably end in depriving the party of life." (Roscoe, 707; 2 Starkie, 711.) This specific malevolence towards the person killed may be embraced in such utter and reckless disregard of life, as shows a man to be an enemy to all mankind; as when a man resolves to kill the next man he meets, and does kill him; or shoots into a crowd wantonly, not knowing whom he may kill. (4 Bl. Com., 200.) In such a case it may well be said,

that he has malevolence towards the particular person killed, because he was one within the general scope of his malignity. The same may be said of one or more persons who enter upon the commission of another felony, in such way as to show a preconceived resolve to kill or do great bodily harm to all or any one who may oppose the design. (4 Bl. Com., 200.)

If the formed design be not to kill the deceased, or inflict on him serious bodily injury, but to commit some other felony, the killing will not be on express malice. A. attacking B. with malice, shoots at him, but misses him and kills C., against whom he bore no malice, it is murder. This is not because of any malice in fact against C., but because of the evil design against B., which, it is said, is carried over against C. by legal implication. (4 Bl. Com., 201.) (How far this instance may be modified by the provision of our code, it is unnecessary now to consider. Art. 49.)

So, if a person in attempting to commit robbery, arson, and the like, is violently resisted and kills the person resisting, he is guilty of murder, on implied malice, though he had no wish to kill the person who was slain; but merely to prevent himself from being injured. (1 Hale, 465.)

A case may be given under this head, illustrative of the one now under consideration in some of its features. "Several persons conspired to kill Dr. Ellis, and they set upon him accordingly; when Salisbury, who was a servant to one of them, seeing the affray and fighting on both sides, joined with his master; but knew nothing of his master's design. A servant of Dr. Ellis, who supported his master, was killed. The court told the jury that malice against Dr. Ellis would make it murder in all those whom that malice affected; as malice against Dr. Ellis would imply malice against all who opposed the design against Dr. Ellis; but as to Salisbury, if he had no malice, but took part suddenly with those who had, without knowing of the design against Dr. Ellis, it was only manslaughter in him. The jury found Salisbury guilty of manslaughter, and three others of murder; and the three others were executed." (1 Russell, 510.) Hale, in his explanation of this case, says it is murder in those having malice against

the master; "for the malice shall be carried over," so as to make the killing of the servant murder. (1 Hale P. C., 438.)

These instances will suffice to explain the principle announced, that the malice must be towards the particular person who is killed, to make it express.

3d. The character of proof by which such formed design is to be discovered. Malice of all kinds must be inferred, because it consists in a quality or state of the mind, either actual or imputed. Its actual existence may be manifested by external circumstances, from which it may be reasonably inferred. In the absence of those external circumstances which make it manifest, it is in some cases imputed as a legal inference, without reference to whether it exists in fact or not. Hence it is said by Mr. Starkie, "malice is either positive and express, or it is implied malice, or malice in construction of law. Malice of the former kind, consists in an actual and deliberate intention, unlawfully to take away the life of another, or do him great bodily harm, and the actual existence of such an intention, is a question of fact to be found and ascertained by the jury. Implied or constructive malice is not a fact for the jury, but is an inference or conclusion, founded upon particular facts and circumstances ascertained by them." (2 Starkie, 711.)

Upon these different modes of arriving at the conclusion that there is malice, arises another consideration in the distinction between express and implied malice. "Malice in fact (express) is a deliberate intention of doing any bodily harm to another, whereunto by law he is not authorized. The evidence of such a malice, must arise from external circumstances, discovering that inward intention; as lying in wait, menacings antecedent, former grudges, deliberate compassings, and the like, which are various, according to variety of circumstances." (Hale P. C., 451.) These antecedent menacings, former grudges, deliberate compassings, and the like, are important, not as matters of aggravation in the quarrel or feud, so much as being facts from which the actual state of the mind may be inferred at the time of killing, and the design which prompted the act. These external circumstances indicating the design, may transpire at the time of the killing, as well as before that time. For although the killing be upon a sudden difficulty,

it may be attended with such circumstances of enormity, cruelty, deliberate malignity, cool calculating compassings, or even calm demeanor and absence of passion, as will be sufficient evidence to establish the inference that the killing was the result of a sedate deliberate mind, and formed design to take life, or do some great bodily harm. (Com. v. Jones, 1 Leigh Rep., 612.) Familiar cases given in illustration of this, are, where a boy was tied to a horse's tail and dragged along and killed; where a master corrected his servant with an iron bar; where a schoolmaster stamped on his scholar's belly, &c. (4 Bl. Com., 199.) The antecedent circumstances, and those that are cotemporaneous with the act of killing, may conspire to lend each other increased force in establishing this inference. (Hill v. The Commonwealth, 2 Grattan (Virg.) Rep., 603–4.) Acts and admissions, or other language of the prisoner, even after the mortal stroke or killing, may often be pertinent evidence, as tending to show express malice at the time of the killing. (The Com. v. Jones, 1 Leigh (Va.) Rep., 670.)

In cases of sudden killing, in the absence of previous ill feeling, or where it is too slight to be presumed to be the motive for the act, there may often be found ample evidence of express malice in the means used, or manner of doing it. For a man is always presumed to intend that which is the necessary, or even probable consequence of his acts, unless the contrary appears.

However sudden the killing may be, if the means used or manner of doing it, or other external circumstances attending it, indicate a sedate mind and formed design to kill, or do great bodily injury, and a murder be committed, it will be upon express malice. (1 Hawkins, 96, sec. 23.) In such case, if it appeared that the means used were likely to kill, or do great bodily harm, endangering life, and a killing took place, the natural inference would be that it was upon express malice; unless it was attended with such circumstances as showed an absence of such formed design, or as showed the act to be the result of an indeliberate, rash, sudden impulse or passion. (Whiteford v. The Commonwealth, 6 Randolph's Rep., (Va.) 723–4.)

The rule that from the isolated fact of killing the malice is implied, and not express, however correct as an abstract proposi-

tion, can seldom be of practical utility, in ascertaining the species of malice. (2 Gratt. 594; Wright (Ohio) 20; Am. Law Homicide, 386; Pennsylvania v. Lewis *et al.*, Addison's Rep., 282.) For that fact will rarely ever be presented in the entire absence of all antecedent or attending circumstances. Whether they be arrived at by positive or circumstantial evidence, they will constitute a legitimate basis for an inference as to the species of malice. The fact that no one witnessed the act of killing, will not necessarily make the rule applicable. In the case of Hill v. The Commonwealth, (in Virginia) the evidence showed, that the prisoner had, some time prior to the fatal transaction, taken umbrage at the decedent. His pride had been wounded. He asked the deceased to walk with him, as he wished to say something to him. He took the deceased from the friends and company that surrounded him, into the shade of the night. He had with him a sword cane; and in the short space of between five and ten minutes, the deceased is seen returning from whence he started, and falls from a stab in the heart by an instrument, such as that in the possession of the prisoner; and the prisoner under the cover of the night flies from his home and his country. These facts alone were held sufficient to warrant the inference of express malice. (2 Grattan Rep., 603–4, 620.)

These views will perhaps sufficiently explain the character of proof by which the "formed design" is discovered.

The object of the proof is to establish the existence of the malice in fact, towards the deceased, (as it has been explained,) at the time of the killing, which prompted him to the commission of the deed. The sufficiency of the evidence to establish it is determined, as that of any other fact, by its effect to reasonably satisfy the mind.

There may be a case where there are facts tending to establish different conclusions as to the kind of malice; some to establish that the killing was upon express, and others that it was upon implied malice. In such case, the only rules as to the effect of the evidence, which it is now necessary to notice, are, 1st: That where "fresh provocation intervenes between the preconceived malice and the death, it will not be presumed that the killing was

upon the antecedent malice."    2d. That though it will not be presumed, it may be proved to have actuated the person in the killing, by the circumstances and facts in the case, notwithstanding the fresh provocation. (2 Starkie, 712; The Commonwealth v. Jones, 1 Leigh's Rep., 612–13–14.)·

It may be concluded, then, in determining whether a murder has been committed with express malice or not, the important questions are: do the external facts and circumstances at the time of the killing, before or after that time, having connection with or relation to it, furnish satisfactory evidence of the existence of a sedate deliberate mind, on the part of the person killing, at the time he does the act? Do they show a formed design to take the life of the person slain, or do him some serious bodily harm, which in its necessary or probable consequences may end in his death ; or such general, reckless disregard of human life, as necessarily includes a formed design against the life of the person slain? If they do, the killing, if it amount to murder, will be upon express malice.

When the facts show, with reasonable certainty, that a murder, with express malice, has been committed, bail should be refused.

We are of opinion, that the facts as presented in the record in this case, do not show with reasonable certainty, that the prisoner is guilty of murder with express malice, and that therefore he is entitled to bail.

Bail allowed.