| 30 | 129 |
|----|-----|
| 31 | 55¼ |
| 30 | 129 |
| 39 | 229 |

</div>

## S. Martinez v. The State.

*No. 7396.    Decided June 24.*

1. **Murder—Charge of the Court—Express Malice.**—The following is a correct and sufficient definition of express malice to be given in charge to the jury in a trial for murder:  "Express malice is where one with a sedate and deliberate mind and formed design unlawfully kills another, which formed design is evidenced by external circumstances discovering that inward intention, as lying in wait, antecedent menaces, former grudges, concerted schemes to do the person slain some bodily harm, or any other circumstances showing such sedate and deliberate mind and formed design unlawfully to kill another, or to inflict serious bodily harm which might probably end in the death of the person upon whom the same was inflicted."

2. **Same—Implied Malice.**—The following is a correct and sufficient definition of implied malice:  "Implied malice is that which the law infers from or imputes to certain acts.  Thus, when the fact of an unlawful killing is established and there are no circumstances in evidence which tend to establish the existence of express malice, nor which tend to mitigate, excuse, or justify the act, then the law implies malice."

3. **Same—Malice.**—The following are correct and sufficient definitions of the term malice:  1.  "Malice is a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed or words spoken."  2. ."Malice in its legal sense means the intentional doing of a wrongful act toward another, without legal justification or excuse."  Either one of these definitions of malice will be sufficient in a charge, and so would any other definition of the term embracing substantially the same meaning.

4. **Murder in the Second Degree—Evidence.**—See the statement of the case for circumstantial evidence held amply sufficient to sustain a conviction for murder in the second degree.

Appeal from the District Court of Frio.    Tried below before Hon. R. W. Hudson.

This conviction is for murder in the second degree, with the punishment assessed at confinement in the penitentiary for a term of fifty years.

The evidence in full is as follows:

John S. Thomas, first witness for the State, testified as follows:  My name is John S. Thomas.  I reside at Bigfoot, Frio County, Texas, and am justice of the peace of Precinct No. 2.  I know the defendant.

[Here witness points out defendant in open court.] On March 2, 1891, I was called upon to go and hold an inquest on the dead bodies of Miguel Robles and Christina Robles. I went down about ten or twelve miles to where the dead parties were. I got there late in the evening, about dark. There were several parties there on the ground when I got there—among others Holly Laxon, the defendant, and some Mexicans whom I did not know. I found there Miguel Robles and Christina Robles, dead. They were on the outside of the house in the yard. Miguel Robles was about fifteen steps south or southwest of the house, and Christina Robles, his wife, was about five or six steps further on in the same direction. Miguel Robles was lying on his face with his head in the direction of the house, while Christina, his wife, was lying on her face with her head from the house. I examined the bodies, and found upon Miguel Robles four or five wounds made with some sharp instrument. I took the wounds to have been made with a knife. There were two or three wounds in his side—I don't remember whether his left or his right side. These wounds were in close proximity and went straight into the body. There was one wound on his shoulder. This was a long wound made with a knife and not very deep. There was also another wound in or about the groin, and not very deep. I don't think he (Miguel Robles) had anything on but his undershirt and drawers. I also examined the body of Christina Robles and found thereon four wounds made with a knife. She had one wound in each breast that went straight in and looked like knife wounds; these were very deep wounds. She also had one wound in the side, low down, near the abdomen. This was a very ugly and deep wound and a very long one. She was enceinte, which was plain to be seen. She also had a wound in her hand, I don't remember which one, but this wound looked as if made while holding to a knife, as her fingers were cut nearly off, and the flesh turned up so you could see the bone, as if the knife had been wrenched around in her hand. She also had nothing on but her nightgown. I also went in the house and examined. I found in there human blood upon the floor. There were two beds in the house—a double bed and a bunk, or single bed. The double bed was in the west end and the bunk in the east end of the house. There was but one room to the house. The defendant said that the two deceased slept in the double bed and that he (defendant) slept in the bunk. I found blood in the house between the double bed and bunk. There was also two trails of blood going out of the house at the east door and leading to where the two dead bodies were. There was also a spot of blood near to the side of the bunk where the defendant said he slept, and this looked as if it had been mashed by some one stepping on it with his bare foot. The floor was plank. There were also spots of blood on the wall of the house next to the double bed and near the head and foot of the bed. This blood was some three or four feet above

the bed on the wall. There was some blood on the double bed, where the deceased were sleeping. There was also found there in the house a linen table cloth, as I called it, stuck full of knife holes, and some of the holes were almost in the same place, there being as many as two and three nearly in the same place. [Here witness was shown a table cloth and identified the same as being the one found in the house of the deceased persons after the killing.] The bodies looked as if they had lain about twenty-four hours in the position where we found them. I held the examinations about 11 o'clock at night on the 2d day of March, A. D. 1891. This was all done in Frio County, Texas.

Holly Laxon, next witness for the State, testified as follows: My name is Holly Laxon. I reside in Frio County, Texas. I know the defendant. [Here witness points defendant out in open court.] On the morning of the 2d of March, A. D. 1891, the defendant and Jenio Silvas and Jesus Garcia came to my house about 8 o'clock. The defendant came to me and showed me his hand, which was cut, but tied up at the time; the blood still being on his hand, dried. He (defendant) told me then that the night before some parties in mask had attacked the house of Miguel Robles and Christina Robles, and he guessed had killed them, and wanted me to go over there and see. He also stated that he and the deceased had all gone to bed, and that he had dropped off to sleep and was awakened by some one coming into the room. That he and Miguel Robles jumped from the bed about the same time, and that the party in mask had a knife in his hand and a gun strapped across his shoulders, and that he (the masked man) made a cut at defendant but missed him and cut or stabbed Miguel Robles; that he heard Miguel grunt as if he had been stabbed; that he (defendant) then ran out of the east door of the house, and that there was another masked man standing at that door and commenced to cut at him; that he (defendant) warded off the blows as best he could, but received the cut in his hand from this party; that he (defendant) at last saw a chance to run and did run, and this masked man ran after him and crowded him so close that he (defendant) had to jump the brush fence that surrounded the house and run out in the brush and squatted behind a bush until this man passed by, and then he went on over to the camp of Jenio Silvas and Jesus Garcia. I then got on my horse and went with these parties to where the murder was committed, but before we got there, and when we were in about eighty yards of the house, the defendant, riding in the lead, rose up in his saddle and says, "Yonder they are, all dead." I could not see anything at that time, and after we got there, and before we got down off of our horses, I remarked that both of the dead parties were men (as the woman had her hair shingled), and the defendant then remarked, "No, that is the woman," pointing her out. The defendant at this time and when he first came to me seemed to be perfectly cool and not much disturbed. I, after

getting there, got down and made the other parties remain on their horses, and began to look around there for tracks, but could find but one track leading from the house in the direction the defendant had told me he had run pursued by the masked man. I then got the defendant and told him to show me where he jumped the fence. He pointed the place out, and I looked good for tracks, but there were none there. I then asked him to show me where the bush was that he stopped behind till the masked man passed. He (defendant) pointed it out. I then went and looked good for tracks there, but there were none. I then asked the defendant to go and squat behind the bush as he had said he had done that night, and he went and squatted down exactly in the same position as he said. I then went and looked and could see his tracks plainly. The defendant told me he thought he heard some one talking that night over about certain live oak trees (pointing them out); I then went over to those trees and looked good but could find no sign of foot tracks. I looked all around the place and at every point suggested by the defendant, and could find but one track leading away from the house, and this track was made by the defendant as he stated. The ground around the house had been freshly plowed, and I could have seen other tracks easily if there had been any. The ground where defendant showed me where he squatted was also not very hard, and a person could have seen a track if any had been there. After looking around the place for some time for tracks and signs of any kind, I went again to where the dead bodies were and examined them. I found upon the body of Miguel Robles five wounds made with a knife. Three were in his right side and went straight into the body and near together; one across his shoulder blade—this one was a long cut and not very deep; also one wound in the groin. I then went to the woman and examined the wounds upon her. She had a deep wound in each breast, and one in her side; this was very ugly and deep. She showed to be enceinte. She also had a cut in one of her hands; I don't remember which. This cut was deep and seemed to nearly cut her fingers off, and showed as if made while grappling with a knife, as the bone of the fingers could be plainly seen and the skin was turned back as if a knife had been turned in her hands. I found blood around the bodies. I then went into the house, found blood in there, also a double bed and a bunk. The double bed was in the west end of the house and the bunk in the east end. There was a stove in the house between the two beds, and the pipe had been knocked down as if a struggle was had between the two beds, or bunk and bed. There were two trails of blood leading from the east door of the house to where the bodies lay; also a trail of blood leading from the bodies toward the west door. There were spots of blood dropped here and there. I found a spot of blood near to the bunk where defendant said he slept; this looked as if it had been mashed with some one's foot. I also found a table cloth

or spread in the house and on the bed where the deceased persons slept. The defendant told me that deceased had covered with that cloth; he supposed it was a warm night and a person did not need much cover, in fact none. While we were there that day the defendant went into the house of deceased and ate heartily and seemed very little concerned about the matter. [Here the witness was shown the table cloth and identified same as being the one found by him on the bed of the deceased persons.] I examined this cloth and found many knife cuts in it, some being very near one another. When I got to the house of the deceased persons that morning, about 8 or 9 o'clock, there was no one there except three little children of the deceased, the eldest being about 5 years old. One of them was still asleep in the bed. I found some blood on the bed and spots of blood on the wall by the bed, about three or four feet above the bed. I also found a spot of blood on the gate about sixty yards from the house, and on this trail or track that I found there. That was all the distance I could trail this track. The deceased persons were in their night clothes when I went there that morning. The defendant when he came to my house had no hat, but had on his other clothes. The defendant told me that he lay down with his shoes on a little while. Also said he got up to make water, and had got one of his shoes on when the masked party came into the house and just pulled the other one on and ran. Then afterward said that he untied his shoes after sitting down on the bunk to go to sleep and was so tired he lay down and went to sleep without pulling them off, and was asleep when said masked party came in. This all occurred in Frio County, Texas, about the 1st of March, A. D. 1891. I lived about one and a half miles from the house of deceased. The deceased Miguel Robles had long dark hair—about four or five inches long.

Jesus Garcia, the next witness, being sworn, for the State, testified as follows: My name is Jesus Garcia. I reside in Frio County, Texas. I know the defendant. [Here witness points defendant out in open court.] On the night of March 1, 1891, about 11 o'clock, the defendant came to the camp of Jenio Silvas, where I was staying all night, and told us that some one had come to the house of Miguel Robles and Christina Robles, in mask, and had killed them, he supposed. That he had escaped and that he wanted us to go over there with him. He (defendant) had no hat on, and seemed to be very much excited. He (defendant) had on a shirt and pants and shoes. His shoes were not tied. He said he could not tie his shoes because his hand was cut. We tried to get him to wash the blood off his hands, but he would not do it, saying that he wanted the justice of the peace or the officers to see it. He had on a shirt that was torn, and said that one of the masked men cut it as he was striking at him with a knife. I looked at the place in the shirt and it was not a cut. He (defendant) said he heard Christina Robles cry out, "What do you want to do with my

husband, Sebreano?" Sebreano is the first name of defendant. I asked him how he come to get cut in the left hand, and he (defendant) said he could use a knife with either hand. Defendant remained at the camp the balance of the night. There was no fire at the camp when defendant came except some coals. We were asleep when he came. The camp was about one and one-quarter miles from deceased persons' house. The next morning we went over to Mr. Youngblood's and from there over to Mr. Holly Laxon's; from there to the house of the deceased persons.

R. W. Kercheville, being sworn by the State, testified as follows: I am deputy sheriff of Frio County, Texas. Was called on about March 2, 1891, to go over to see about the killing of Miguel and Christina Robles. When I got over there, about 3 or 4 o'clock in the evening, I found several parties there, among others Mr. Holly Laxon and defendant, and others whom I do not now remember. I got the justice of the peace to ask defendant how he came to have his shoes on when these masked men came in, and defendant said that he sat down on his bunk, untied his shoes, and was so tired he turned over on the bed without pulling them off. I also examined for tracks, and could find but one track leading from the house, and this was in direction defendant said he went. When this track first started it looked as if the person that made it was running, and then it came down as if the person was in a long walk. I found a splotch of blood in the house, and near and next to the bunk where defendant said he slept. This blood looked to be mashed, as if by some one stepping on it. On the 3d of March, 1891, and after I had arrested defendant and put him in jail, I examined his feet and found upon the bottom of one of his feet a splotch of blood that compared in size to the splotch of blood on the floor of the house near and adjacent to the bunk where defendant said he slept on that night. I know this was blood that I found on defendant's foot as well as I know that there was blood on the floor of the house where the killing was done. I took it to be blood and believe it was blood. This was on the 3d of March, 1891, when I examined this defendant's foot and found what I took to be blood.

R. W. Hill, the next witness for the State, testified as follows: I was on the ground of the killing the next evening after, and looked for trail or tracks and found but one, which led off in direction which defendant went, but never jumped the fence, but went to the gate, about sixty yards from the house. When the track first started in the edge of plowed ground it looked as if the person might be running there. It came down to a long walk. I stepped it to see. Where the defendant stated he run from the house and was pursued by the man at the door there was only one track and only one person went along there, there being no track or sign of a second person along with the tracks of defendant.

Dr. J. I. Barnes, the next witness for the State, testified as follows: I am a practicing physician of this county. A few days after the killing of Miguel Robles and Christina Robles I was called into the jail to dress the wound upon the hand of the defendant here. The wound was in the hand and the blood was still on it. There was a deep wound in the palm of the hand and other slight cuts on fingers inside of hand. I dressed this deep wound, and in washing out the wound, which contained clotted blood, I found a human hair in the wound. The hair was four or five inches long and was a dark colored hair. This wound in the hand extended up between the thumb and forefinger and looked as if made with a knife being drawn through the hand.

Joe Madison, the next witness for the State, testified as follows: I was called on to go to the scene of the killing on the 2d of March, 1891. I got there in the evening of that day. When I got there, Mr. Laxon, the defendant and others were there. I went from there to get John Thomas, justice of the peace, and returned with him late that evening, about night. I have known the defendant about seven months and have known Miguel Robles and Christina Robles, the deceased, about two years. The defendant was living with the deceased at the time of their death and had been for some time. The deceased persons were living on my place in Frio County, Texas, at the time they were killed. On the 4th of March, A. D. 1891, I found in the house where Miguel Robles and Christina Robles were living a box containing a new saddle, which was in a sack, and also some gin bands, which were also in a sack. These goods I shipped to J. C. B. Harkness of Frio County. I did not know whose they were—the relations of the deceased did not claim them. I also found a pair of pants which I recognized as being the defendant's. These pants had blood on them, in spots.

Here the State closed.

John S. Thomas, called by the defendant, testified: Defendant at inquest told me he slept in the bunk. This statement was part of the testimony at the inquest, and was not stated to me at any other time. The written statement you showed me was the one made by the defendant at the inquest. I issued a commitment to the sheriff to put defendant in jail. This was the next day after the inquest. I ordered the deputy verbally on the 3d of March to jail defendant.

Defendant next introduced the written statement of his testimony taken at the inquest, which is as follows: Sevarinos Martinez, being sworn, deposes and says: My name is Sevarinos Martinez. I live in Frio County, Texas. Knew Miguel Robles and Christina Robles. [He points them out and says they are now dead; says they were murdered; says he don't know who killed them.] They were killed on the 1st day of March, 1891, after dark. The night they were murdered I was lying down in the house. Miguel Robles, Christina Robles, and their

three children were lying down in the same house that I was. There was no one else in the house. The building did not contain but one room, and we were all lying in the same room. There was no one else here during the day, except myself, of March 1, 1891. The deceased and his family were gone all day on a visit on March 1, 1891. They returned about dark of the same day. I am certain I saw one man come in the house. I was asleep when he came in the house. The man struck at myself and Miguel Robles when he came in the house. We were about the middle of the room when he struck at us. I don't know who he hit. He did not hit me. Miguel did not say anything to me. Knew it was Miguel Robles whom I ran against, because I know him well. I never saw him any more. I then went to the San Miguel to get some one to come and see about it. I found a man [he points him out], but do not know his name. Witness points out Jenio Silvas. I told him I wanted him to come over with me to this ranch and help me. I did not tell him that Miguel Robles was killed. I jumped up when the man came in the room because I was scared. I saw one other man just outside the door as I came out. The man cut me in the hand. This all happened before moon up. When he struck at me I caught the knife. I saw the knife plain when he struck at me. I don't know what kind of a knife it was. I never heard any hallooing as I ran off from the house.

Recalled, he testified: The man came in the house. He had a gun strapped on his back. I laid down with my shoes on a little while.

*John A. Green, Jr.*, and *West & McGown*, for appellant.

*R. H. Harrison*, Assistant Attorney-General, for the State.

### ON MOTION FOR A REHEARING.

DAVIDSON, JUDGE.—At a former day of this term the judgment in this cause was affirmed without a written opinion. There is a bill of exceptions in the record reserved to the charge, because "it did not properly define express malice aforethought or implied malice aforethought."

Since the affirmance appellant files a motion for rehearing, as follows, to-wit: "The court erred in not sustaining defendant's bill of exception number 1, which bill complained of the error of the trial court in not charging upon and fully explaining to the jury malice aforethought," and in support of appellant's contention that the court ought to have explained to the jury malice aforethought, he submits the attached authorities: Washington v. The State (not reported); Ainsworth v. The State, 29 Texas Court of Appeals, 599; both decided at the present term of this court. The two cases cited were decided on the same day

on which appellant's case was affirmed, and both of said cited cases were reversed, among other reasons because the trial court in his charge failed to define malice. The question decided in said two cases is not a novel proposition in this State, and was not prior to the two cases cited. Crook v. The State, 27 Texas Ct. App., 198; Childres v. The State, 13 S. W. Rep., 650; Willson's Crim. Stats., sec. 1061; Richardson v. The State, 28 Texas Ct. App., 216.

By reference to the bill of exception mentioned in the motion for rehearing, it will be seen that it was reserved to the supposed error on the part of the trial court in failing to define express and implied malice. The charge thus defines express malice: "Express malice is where one with a sedate and deliberate mind and formed design unlawfully kills another, which formed design is evidenced by external circumstances discovering that inward intention, as lying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm, or any other circumstances showing such sedate and deliberate mind and formed design unlawfully to kill another or to inflict serious bodily harm, which might probably end in the death of the person upon whom the same was inflicted.

"Implied malice is that which the law infers from or imputes to certain acts. Thus when the fact of an unlawful killing is established and there are no circumstances in evidence which tend to establish the existence of express malice, nor which tend to mitigate, excuse, or justify the act, then the law implies malice."

These charges are precisely in the language contained in Willson's Criminal Forms, Nos. 710, 711, and which have been recognized as the correct rule for charging upon and defining the two phases of malice. Jordan v. The State, 10 Texas, 479; McCoy v. The State, 25 Texas, 33; Farrer v. The State, 42 Texas, 271; Plasters v. The State, 1 Texas Ct. App., 673; Cox v. The State, 5 Texas Ct. App., 493; Sharpe v. The State, 17 Texas Ct. App., 486; Harris v. The State, 8 Texas Ct. App., 90; Douglass v. The State, Id., 520; Neyland v. The State, 13 Texas Ct. App., 536; Reynolds v. The State, 14 Texas Ct. App., 427; Turner v. The State, 16 Texas Ct. App., 378; Hubby v. The State, 8 Texas Ct. App., 597; and numerous other authorities.

While the bill of exceptions is not reserved to any supposed defect of the charge in failing to define the term malice or malice aforethought, yet the question sought to be raised will be treated as if it was so reserved. By an examination of the charge we find this language contained therein: "Malice is a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed or words spoken." This form of definition is now and has been recognized as a correct one by the courts of last resort, as announcing a true rule by which to measure malice under our statute of murder. Another rule laid down

as equally correct is thus defined: "Malice in its legal sense means the intentional doing of a wrongful act toward another without legal justification or excuse." Sometimes one of these forms is employed in the charge and sometimes the other, and some of our judges use both. It is wholly immaterial which is used, as they convey substantially the same idea. Judge Clark, in a carefully considered opinion, in speaking of a proper definition of the term malice, said that "a perfectly exact and satisfactory definition of that term, signifying its legal acceptation in a form at once clear and concise, has been often attempted, ⸱but with no very satisfactory permanent results. The differing minds of different courts have employed different terms and language in an attempt to convey substantially the same meaning; and while a general similarity is apparent in all the definitions, the legal mind has not yet crystallized the substance of the term into a terse sentence readily comprehensible by the average juror. About as clear, comprehensive, and correct definition as the authorities afford is, that 'malice is a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed or words spoken.'" Harris v. The State, 8 Texas Ct. App., 109, 110; McKinney v. The State, 8 Texas Ct. App., 643; Gallaher v. The State, 28 Texas Ct. App., 266, and authorities cited; Bramlette v. The State, 21 Texas Ct. App., 619; Pickens v. The State, 13 Texas Ct. App., 357, and cited authorities; Hayes v. The State, 14 Texas Ct. App., 331, 332; 3 Crim. Law Mag., 216; Willson's Crim. Forms, 708.

The authorities sustain the definition of malice embraced in the court's charge as given in this case. Other language might be used to convey the same idea, and other words could be employed that would give as satisfactory definition of the term malice as is employed in the two forms quoted above. We do not intend to say that such a result could not be reached. We simply say that the forms given by Judge Willson are sufficient and are abundantly supported by the authorities. We can not agree with appellant that malice or malice aforethought is not defined in the charge, because the record shows directly to the contrary from the above quoted charge defining malice. We find that term fully defined. Not only so, but the terms "express malice" and "implied malice" are also fully and legally defined in said charge.

The two recent authorities cited by appellant are not applicable to this case. Malice is defined in the charge in this case, whereas in those cases it was not defined, nor was a definition thereof sought to be given by the court.

The grounds of the motion for rehearing are not sustained by the record, but pointedly contradicted thereby.

The record shows a cruel and heartless killing of a man and his wife in the dark hours of the night. They were evidently attacked while sleeping in their bed in their own house, and by defendant, whom they

trusted as their friend, and whom they afforded the friendly protection of their home and roof. When they were aroused by the murderous assault of defendant they fled from their house into the protection of the night outside. Here they were pursued by his fiendish malice and chased down and stabbed to death in an atrocious manner in their own yard. The verdict in assessing his punishment at confinement in the penitentiary for a term of years was lenient and merciful, and he has reason to congratulate himself therefor.

We see no reason why we should recede from our former opinion, and the motion for rehearing is therefore overruled.

*Motion overruled.*

Judges all present and concurring.