## HALBERT CALVERT V. THE STATE.

### No. 3308. Decided November 11, 1914.

**1.—Aggravated Assault—Serious Bodily Injury—Insufficiency of the Evidence.**

Where, upon trial of aggravated assault caused by inflicting serious bodily injury, the evidence showed that the person assaulted called defendant a d——d liar, whereupon defendant with his fist struck him on the right cheek or jaw, from which he fell, striking his head either against an auto or the curbing of the sidewalk, and that from said fall a fracture of the skull occurred producing insanity, etc. Held that the result of defendant's blow by which the party assaulted fell and struck his head against the curb on the sidewalk was not the necessary or probable result and not in contemplation of defendant when he struck the blow, and the facts did not constitute aggravated assault. Prendergast, Presiding Judge, dissenting.

**2.—Same—Evidence—Declaration of Third Parties.**

Upon trial of aggravated assault, testimony with reference to certain entries in a book, of independent matters between third parties, should not have been introduced.

**3.—Same—Argument of Counsel.**

Counsel for the State are admonished not to go outside of the record in their argument.

**4.—Same—Charge of Court—Excessive Force.**

Upon trial of aggravated assault, where the evidence did not raise the issue of the use of excessive force, the court should not have charged on this matter; however, the record did not properly present this issue on appeal.

**5.—Same—Filing—Duty of Clerks.**

Clerks of the lower courts are admonished that they must take time to properly file papers and make the transcripts show the proper filing, and to be more careful in following the rules and practice in regard to such matters.

Appeal from the County Court of McLennan. Tried below before the Hon. Geo. N. Denton.

Appeal from a conviction of aggravated assault; penalty, a fine of $200 and six months confinement in the county jail.

The opinion states the case.

No brief on file for appellant.

*C. E. Lane,* Assistant Attorney General, for the State.

DAVIDSON, JUDGE.—The information contains two counts. Only the second count was submitted to the jury, which charged an aggravated assault upon J. B. Woody on the part of defendant by striking Woody with his fist and knocking him down, which caused his head and skull to come in contact with the pavement of the street and sidewalk where the assault occurred, thereby causing to be inflicted serious bodily injury on Woody.

Without going into a detailed statement, the facts, in substance, disclose that Woody was the owner of a gin. Appellant had been running

the gin, taking part of the profits for his pay. Woody had been collecting tolls due the gin without accounting for any of it to appellant, which caused Woody to be indebted to him for a considerable amount. There is some evidence of ill-will between the parties, and the State introduced threats on the part of appellant to whip or inflict injury upon Woody. There is evidence going to show that Woody was a contentious man and evaded paying his debts. The immediate facts show, substantially, that Woody was on the street in the city of Waco, with his foot on the fender of an automobile talking to the occupant of the automobile when appellant passed along the sidewalk. Seeing Woody, he said to him, that as soon as he finished his conversation he desired to see him. Woody turned and went to appellant. They shook hands, and appellant handed him a letter and asked him what he meant by writing it. Woody said he knew nothing about it. Appellant said you surely do, whereupon Woody says, "You are a God damned liar," whereupon appellant with his fist struck him on the right cheek or jaw, from which Woody fell. In falling Woody's head struck the auto, causing him to roll from it. His head struck the curbing. The witnesses widely differ as to the point of contact of Woody's head in falling, whether it was the auto or the curbing. Appellant went to the city court and offered to make bond. That court declined to take his bond or to receive a fine. Appellant was arrested and charged with aggravated assault. He testifies that he struck Woody upon being called a God damned liar but with no purpose or intent to really injure him. The physicians show that there was on the left side of his head behind his ear a fracture of the skull something like an inch or an inch and a half in length which produced unconsciousness, and that he was in this condition for some time. They also state that the blow produced insanity. In this connection it is indicated that the insanity was produced from a growth on the inside of the skull at the point of fracture.

Appellant contends under this state of case he was and is not guilty of aggravated assault. Aggravated and simple assault were both submitted to the jury. We are of the opinion the facts do not constitute aggravated assault. The trouble was a sudden one; ill-feeling between the parties; one blow struck with the fist, and the witnesses indicate that it was not a severe blow, but that it did knock him down. Wherever a party inflicts intentional injury the intent to injure is presumed, and it rests with the party inflicting the injury to show the innocent intent or want of purpose to inflict the injury. In this case there could be no question of appellant's intent to strike with his fist, for he did it intentionally on account of having been called a God damned liar. The result of that was to knock Woody down. The fact that his head struck the auto or curb was evidently not in contemplation. If the injury be considered serious, within contemplation of the statute, then the proposition confronts us whether it was a natural and probable result of a blow. That appellant intended to strike with his fist is evident. Whatever was the natural or intended result of that blow would be imputed to appellant. If he did not purpose or have in mind

the idea of knocking him against the curb or the auto or both, then he should not be held responsible for that result. That he did not so intend is clear, and it is equally clear that it was an accident not contemplated at the time by appellant.· He says he had no intention to injure or to hurt him, but was resenting the language used by Woody. The striking of the auto or the curbing, either or both, was the result, it is true, of the fall, but it was accidental and evidently not in contemplation. It would be straining the facts beyond any legitimate conclusion to hold that appellant contemplated that he would strike either the auto or the curbing, or that he even would fall, as the witnesses testified the blow was light. The meeting seems to have been purely accidental, and the fight came up in the manner stated. The result was not necessary or intended result but an accident. Under this condition of the evidence we are of the opinion that aggravated assault was not in the case.

There are other errors in the record that should not have occurred. Some of these are pointed out by bills of exception, but in such an indefinite way as hardly to be considered. One of the bills recites that Gardner was permitted to testify that the firm of Woody & Calvert owed the Industrial Cotton Oil Company approximately $265; that such proof was made by introducing a ledger in which the witness testified he did not make all the entries in relation to the accounts of Woody & Calvert, and which he, witness, testified was not the book of original entry, but was the book of third entry; that is, the original entries were made on vouchers, thence transferred to a cash book and then into the ledger. All this was objected to, but no grounds of objection stated. The court approved this bill by stating that Gardner was bookkeeper for the Industrial Cotton Oil Company, and that it was his duty to keep the ledger introduced in evidence; that the vouchers on which the original entries were made were very voluminous, covering one whole side of the office in which they were kept, and that the vouchers representing the items introduced from the ledger were scattered indiscriminately through this large volume; that the vouchers were entered into the cash book in the order they were issued regardless as to whose account they were later to be transferred and the ledger was the first book of the complete system in which the items were placed in individual accounts. What the accounts, ledger and books of the Industrial Cotton Oil Company had to do with this transaction is not made to appear. We are of opinion upon another trial these independent matters between third·parties should not be introduced. If the contention was that Woody & Calvert had been partners in the gin business, then the entry on the ledger of the Industrial Cotton Oil Company would not be proof of that fact or any evidence of it, unless it was in some way shown that this was called to the attention of appellant so as to show that he was being treated by this oil company as a partner in the transaction, provided that was an issue in the case.

There is some complaint also of the county attorney's argument. We

are of the opinion that the county attorney went a little too far, and upon another trial he should be a little more circumspect.

There is also a clause in the charge to which we call attention, though not so presented here as to require a reversal, this being a misdemeanor. The court charged with reference to the use of excessive force. That was not and could not be an issue in this case. The State's theory was that appellant struck with his fist, knocking Woody down and incidentally his head struck against the auto or curbing. Appellant's theory was when Woody called him a God damned liar he raised a loaded walking stick, which witnesses all say he was carrying, and threatened to strike him with it, and that he struck with his fist in self-defense. There is nothing in this case which calls for the doctrine of excessive force.

There is also a matter called to our attention by the Assistant Attorney General in regard to the condition of this record. None of the papers show to have been filed. The evidence and all the evidence shown by the record of their filing is that on the margin of the transcript it is noted 7-10-14 by way of illustration. We suppose that this was intended to show that that document was filed on 10th of July, 1914. In regard to the statement of facts we find this 9-4-14, which presumably was intended for the 4th day of September, 1914, but nowhere in the record does the clerk place his file mark upon the papers or show that they were ever filed outside of the above statement. This occurs with reference to various other papers in the transcript. We hope this matter will not occur again and that the clerks or their deputies will take time to properly file papers and make the transcript show the proper filing. The file mark is often very important in this court to know whether the law has been complied with in filing papers within the time allowed by law so as to be considered on appeal. We hope not to be called on to mention such matters as these, and the clerks will be more careful, following the rules and practice in regard to such matters.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

HARPER, JUDGE.—I concur in the reversal of the case, because in my opinion the evidence would not support a verdict finding appellant guilty of aggravated assault. The only serious injury shown is that in the back of the head, caused by Woody striking something in his fall. This injury, in my opinion, the evidence does not even suggest was the necessary or probable result of appellant's acts, and could not have been contemplated by him when he struck Woody in the face for calling him a liar. The blow in the face caused no injury, and the witnesses all say that it was but the spontaneous act of a man when called a liar.

The other matters presented, I do not think present any error.

PRENDERGAST, PRESIDING JUDGE (dissenting).—The indictment was in two counts. Only the second was submitted. After the necessary preliminary allegations it averred: That on or about December

20, 1913, appellant "did then and there unlawfully make an aggravated assault and battery in and upon J. B. Woody and did then and there strike said J. B. Woody with his fist, and did thereby knock the said J. B. Woody to the ground and cause the head and skull of said J. B. Woody to come into violent contact with the pavement of the street and sidewalk where said assault occurred, and did thereby inflict and cause to be inflicted upon the said J. B. Woody serious bodily injury."

The last ground of appellant's lengthy motion for a new trial is this: "Because the evidence is not sufficient to warrant a conviction for aggravated assault." This is the only thing on the subject in any way in the record.

From the whole record the charges given by the court in his main charge and the one given specially requested by appellant and those refused, and all the evidence it occurs to me that this last ground of the motion for new trial was thrown in rather for good measure and that it was not seriously contended at the time of the trial nor when the motion for new trial was acted upon that the evidence was insufficient to sustain the verdict. Appellant has in no way briefed the case.

Whenever such question is raised for this court to pass upon it is a legal question, and in considering it, it is necessary and proper to look only to what evidence will sustain the verdict, and it is not necessary to consider or give the evidence which tends to support an acquittal. It must always be also considered that the jury believed the incriminating testimony and did not believe the exculpatory testimony. The credibility of the witnesses and the weight to be given to their testimony, by our statute, is exclusively for the jury and the court below and not for this court.

Mr. Woody, the assaulted party, did not testify for the reason that he was then insane,—and had been so adjudged—directly from the effects of the assault and battery committed upon him by appellant. He was, however, produced before the jury so that the doctor who testified could show and exhibit to the jury where and how his skull had been injured. Appellant was also, of course, present at the trial, and testified. The jury, therefore, saw both parties necessarily. In addition, the uncontradicted evidence showed that appellant was a strong man used to physical labor; that he was six feet tall and weighed 175 or 180 pounds; that Woody was not such a strong man, though he was also about six feet tall and he would not weigh more than about 125 to 140 pounds.

The testimony, without contradiction, showed that Woody owned a gin in the country near Waco; that appellant had a working interest in it and run it for Woody. He himself said: "I was working for a third of the proceeds and my wife was boarding the hands," and that he only had a working interest in it. Woody only occasionally went out to the gin while it was being run. It was not paying much and he became dissatisfied. Thereupon, appellant quit about December 15th. Appellant claimed that Woody owed him about $352 for his part of the ginning and the grub that he had furnished the hands; that he

did not know Woody was dissatisfied until some of the patrons of the gin told him they had received letters from Woody asking them not to settle with appellant for the ginning. As soon as he found that out he came to town and demanded a settlement by Woody; he claimed they agreed on the balance due him and Woody said he would pay it in a day or two; that he then wanted appellant to take a vendor's lien note, but appellant declined and stated he wanted the money; that while he was at work out there, about December 20th, he got a letter from some attorney,—not from Woody—telling him that they were going to look to him and his bondsmen for a balance of about $600 or $700 that was due on the gin, and that he, appellant, was under a $1000 bond for it at that time. He claimed that Woody had promised to pay him on dates fixed between the 15th and 20th of December and had failed to do so. There is no testimony that Woody was contentious about paying his debts. Like a great many other men, he may not have been able then to pay. The assault and battery occurred in the evening of December 20, 1913, within five days after appellant claimed that he and Woody had agreed that Woody owed him $352.

Jesse Mimms testified that he knew both Woody and Calvert and that he had an interest in the gin at which Calvert worked and that he went out there with Woody; that the gin was not paying and Woody wanted to sell it. "I heard Halbert Calvert say that if Woody did not pay him he was going to beat the hell out of him."

L. L. Sisco testified: "About two or three o'clock I was in the saloon at the corner of Fifth and Franklin Streets and Calvert (appellant) and a crowd of fellows came in and asked for Woody. He (appellant) seemed to have had a drink or two and said he was going to beat the s—t out of him if he did not pay him. I was afraid that there would be trouble and called up Woody and told him not to come to town."

Dan Dismuke testified: That he was proprietor of the City Market in Waco; that he saw appellant about a week before he struck Woody in said saloon "and he was inquiring for Mr. Woody and said he would beat the s—t out of the damn son-of-a-bitch if he did not pay him. I saw Calvert was mad and was drinking so I went to the phone and called up Woody and told him not to come to town that afternoon." That on the afternoon of the encounter he again saw appellant in said saloon about two o'clock "and he (appellant) said he was going to break his (Woody's) neck if he did not pay his money and that he was going to cut his damn throat." (In an attempt to break his neck, he actually broke his head, which resulted worse to Woody.)

The uncontradicted testimony from all the witnesses,—and there were several,—showed that Woody was on the sidewalk at the corner of Fifth and Franklin Streets in Waco in front of said saloon standing with one foot on the edge of the sidewalk, the other on the step of an automobile two feet or less from the sidewalk talking to two men therein; that while so engaged appellant came along and when he got to Woody told him he wanted to see him when he got through, and he (appellant) then stepped back a few steps from Woody; that when

Woody got through talking with the men in the automobile he turned around and walked up to appellant, appellant then handed him the said letter which he had received from the attorney. Woody held the letter in his left hand and read it. One witness testified appellant asked him, "What do you mean by treating me this way?" Woody replied he did not know anything about it. Appellant said, "You surely do." Woody again said he did not, when appellant said, "Yes, you certainly do know something about it," then Woody called him a God damned liar. Appellant himself testified that when he handed Woody the letter, "I merely asked him for an explanation as to why me and my bonds-men were being threatened with a suit for a claim that he owed individ-ually, and, of course, when he said he did not know anything about it, I did not like it very much."

All the witnesses testified that when this conversation took place be-tween appellant and Woody, and Woody called him a liar, appellant struck Woody in the face and knocked him down, Woody falling straight back from the blow. The witnesses differ as to whether Woody's head struck the automobile or the pavement of the street, or the edge of the sidewalk. Some of them swear positively his head did not strike the automobile, but instead, struck the pavement and sidewalk. There were several eyewitnesses to the assault and battery. The edge of the side-walk at this point was a foot or more higher than the paved street.

Henry Smith swore that he was right at the parties, looking at them, saw the whole thing, and said: "I know Mr. Calvert was mad because I could tell from his eyes." All that had occurred between Woody and appellant about the gin, and appellant's repeated threats clearly showed he was then very mad at Woody.

All the witnesses say that when Woody was felled by the lick from appellant, and his head struck, as stated, his body then rolled off of the sidewalk on to the street. Several of them immediately ran to him to pick him up. Every one of them, and there were several, who testified on the subject, said that they thought Woody was killed.

Pat Morgan said that when they picked Woody up "blood was run-ning from Woody's eyes, nose and mouth." He was then immediately carried into the saloon and all the witnesses say, in effect, that blood was running from Woody's eyes, nose, mouth and ears. All the wit-nesses thought he was killed. Some of them, however, then pulled one of his eyes open and concluded he was not dead and a physician was sent for. The one first to him, Dr. Womack, said: "When I first saw him he was all covered with blood and was lifeless and I did not think he could live." Upon further examination he discovered that his skull was fractured, and thinking he might be able to survive, he had him at once moved to a sanitarium and called another doctor, Dr. Conally; they both examined him and both swore that his skull was fractured at the back part of his head; that he was unconscious, flighty, and remained so for a long time; they performed an operation on his skull and in the course of a few weeks he was removed from the sanitarium to his home. The doctors state, in effect, that the injury

inflicted was serious; that he had never recovered mentally from it and that it caused his insanity, and that he had been adjudged insane and at the time of the trial, which occurred in July, 1914, he was still insane.

Our statute (art. 1008, P. C.) is: "The use of any unlawful violence upon the person of another with intent to injure him, whatever be the means, or the degree of the violence used, is an assault and battery."

"An assault or battery becomes aggravated . . . (subdivision 7) when a serious bodily injury is inflicted upon the person assaulted." (Art. 1022, P. C.)

"When an injury is caused by violence to the person, the intent to injure is presumed. . . ." (Art. 1009, P. C.)

"The intention to commit an offense is presumed whenever the means used is such as would ordinarily result in the commission of the forbidden act." (Art. 51, P. C.)

Judge White, in section 74 of his Ann. P. C., says: "A man is always presumed to intend that which is the . . . probable cause of his act. . . ." Citing McCoy v. State, 25 Texas, 33; Aiken v. State, 10 Texas Crim. App., 610; Lane v. State, 16 Texas Crim. App., 172; High v. State, 26 Texas Crim. App., 545, and other cases from this court. There is no question but that this is the law of this State.

The evidence was clearly sufficient to show and for the jury to believe and find that the appellant was very mad at Woody and had been for several days and especially at the time he knocked him down and so seriously injured him. The evidence shows several reasons why appellant was mad at Woody, among them was that Woody had notified the patrons of the gin not to pay appellant for the ginning and pay him, Woody, therefor. This caused him, as he himself says, to at once quit running the gin and seek and demand a settlement. He claims that Woody then admitted that he was indebted to him $352 and could not or would not then pay him; that he then repeatedly made serious threats against Woody to do him very serious bodily harm because he would not or could not pay him at once; that almost immediately before he knocked him down and so seriously injured him, appellant was drinking and in the saloon right at where this occurred inquiring for Woody and then repeating his serious threats against Woody; so much so that the witnesses who heard it were alarmed for Woody and saw and knew that appellant was very mad at him, and they phoned Woody of appellant's threats and urged him not to come to town on the streets on that occasion so that appellant could execute his serious threats. The evidence further clearly justified the jury to conclude and believe, as they did, that appellant continued his search for Woody until he found him at which time he tried to execute his threats, "break his neck," but instead broke his skull, rendered him insane—which is even worse. He saw and knew the location where he then had Woody; he saw and knew the character of the sidewalk and the pavement; he called Woody some two or three steps from the edge of the sidewalk where he was then engaged in his business and conversation with persons in an automobile,

back to him and talked to him with appellant's back towards the building and Woody's towards the street and edge of the sidewalk. He could not help but know and contemplate that if he then struck Woody, and knocked him down backward in an effort to break his neck, that his head would necessarily strike the pavement or sidewalk or both. He knew that he was a powerful, strong man, six feet tall, weighing 180 pounds and could not help but know that a stroke from his powerful arm into the face of Woody would knock Woody·down, as it did, and either break his neck or break his head. He did strike him such a blow as immediately felled him backwards and caused his head to violently come in contact with the sidewalk or curbing which fractured his skull, and all the witnesses and doctors who then saw him believed that the blow and the fall from it had killed Woody. There can be no question that the injuries thus inflicted were serious, very serious. No one can question, from the facts, that appellant intended to strike and cause injury by violence to Woody and that he did so. Neither can there be any question but that his intention was to strike and do violence to Woody and that the means he used were such as would reasonably and ordinarily result in serious injury to Woody. In my opinion the evidence, under the law, was amply sufficient to show that appellant committed an aggravated assault and battery upon Woody and to justify the jury to so believe and find as they did.

Among other things, the court told the jury that even though they should believe from the evidence that appellant did commit an assault and battery upon Woody, yet, if they found the assault and battery "was not the direct and proximate cause of the injury inflicted upon Woody and that it was not a serious injury" to acquit him of aggravated assault.

Some of the witnesses swore that Woody's head, when he was knocked down by appellant, first struck the said automobile step or hub. Others swore positively that it did not strike either the step or hub of the automobile but that it struck the sidewalk and pavement of the street. At appellant's instance the court gave his special charge to the effect that if they believed from the evidence that appellant did strike said Woody with his fist and that serious bodily injury resulted therefrom, and further that said injury was the result of said Woody's head coming in contact with the automobile step or hub, or if they had a reasonable doubt of it, and that the injury was not inflicted by the head of said Woody coming in contact with the curb or pavement, as alleged in the indictment, then to find him not guilty of an aggravated assault and battery.

No question is raised or intimated by the evidence that the injury to Woody by appellant was the result of an accident. No question of accidental injury was in any way raised. Appellant, a powerful man, intentionally struck him a blow with such force as to immediately fell him backwards to the sidewalk and pavement full length. None of this, as stated, intimated an accidental stroke or anything that would indicate an accidental knocking down on the sidewalk or street.

Some of the witnesses say appellant did not strike Woody a "very hard blow." Perhaps their idea of a very hard blow was that as it did not sever his head from his body, or didn't break his neck, it was not "a very hard blow."

In my opinion the evidence was amply sufficient for the jury to convict appellant of aggravated assault and battery, and they should have done so, and the judgment should be affirmed. I dissent from its reversal.